UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLEN FLORA DENTAL CENTER
LTD., RIVER WEST SMILE CENTER
LTD., ORAL KARE NETWORK II LTD.,
ALL FAMILY DENTAL LTD.,
BEVERLY SHORES SMILE CENTER
LTD., and DENTAL PRACTICE
DEVELOPMENT LTD.,

        Plaintiffs,

        v.

FIRST EAGLE BANK, LARRY
KELLIHER, MIKKI FRANCIONE, and
LENNY VIHNANEK,

        Defendants.

No.   1:17-cv-09161

## COMPLAINT

Plaintiffs Glen Flora Dental Center Ltd., River West Smile Center Ltd., Oral Kare

Network II Ltd., All Family Dental Ltd., Beverly Shores Smile Center Ltd., and

Dental Practice Development Ltd. complain as follows against Defendants First

Eagle Bank, Larry Kelliher, Mikki Francione, and Lenny Vihnanek:

### Jurisdiction

1. Jurisdiction is proper under 28 U.S.C. § 1331 (federal-question jurisdiction),

18 U.S. Code § 1964(a) (jurisdiction over civil RICO claims), and 28 U.S.C. § 1367

(supplemental jurisdiction over state-law claims).

1

2.  Venue in this district is proper under 28 U.S.C. §1391(b). All events occurred within the Northern District of Illinois and all parties reside or have offices within the Northern District of Illinois.

### Parties

3.  Plaintiff Glen Flora Dental Center, Ltd. is an Illinois corporation that operates a dental practice located in Waukegan, Illinois.

4.  Plaintiff River West Smile Center, Ltd. is an Illinois corporation that operates a dental practice located in Chicago, Illinois.

5.  Plaintiff Oral Kare Network II, Ltd. is an Illinois corporation that operates a dental practice located in Cicero, Illinois.

6.  Plaintiff All Family Dental, Ltd. is an Illinois corporation that operates a dental practice located in Chicago, Illinois.

7.  Plaintiff Beverly Shores Smile Center, Ltd. is an Illinois corporation that operates a dental practice located in Chicago, Illinois.

8.  Plaintiff Dental Practice Development, Ltd. is an Illinois corporation that operated a dental-practice management company located in the Chicago area.

9.  Defendant First Eagle Bank (the Bank) is the alias of First Eagle Bancshares, Inc., which is a Delaware corporation that does business and has offices in Cook County and DuPage County, Illinois.

10. Defendant Mikki Francione (Mikki) is the sister-in-law of Lenny.

11. At all relevant times, Mikki was employed by the Bank as a client relationship manager and acted as its agent.

2

12. Defendant Larry Kelliher (Larry) was employed as Chief Financial Officer and Secretary and Treasurer of Plaintiff Dental Practice Development, Ltd., and later as President, from 1996 to 2016.

13. Defendant Lenny Vihnanek (Lenny) was employed as President of Plaintiff Dental Practice Development, Ltd. from 1995 through 2012.

### The Enterprise

14. Glen Flora Dental Center, River West Smile Center, Oral Kare Network II, All Family Dental, and Beverly Shores Smile Center (collectively, the Dental Practices) are owned by William Li.

15. Dental Practice Development (the Management Company) provided business-management services to the Dental Practices.

16. The Management Company was owned by William Li and George Zehak.

17. Li has been a practicing dentist since 1978.

18. Zehak has been a practicing dentist since 1977.

19. In 1996, Lenny, who was then employed by the Management Company, introduced Li and Zehak to Larry.

20. Lenny introduced Larry as a friend and as someone who could be trusted.

21. Lenny urged Li and Zehak to hire Larry as an executive of the Management Company.

22. Based on Lenny's recommendation, Larry was hired and began working for the Management Company in 1996 as an officer and executive.

23. Larry held various executive positions in the Management Company, including

3

Secretary and Treasurer, Chief Financial Officer, and President.

24. Among the services provided by the Management Company to the Dental Practices were the following:

   a. hiring dentists and staff, including managers, receptionists, assistants and hygienists;

   b. handling every aspect of payroll;

   c. negotiating agreements with dental supply and equipment companies and dental labs;

   d. negotiating leases and insurance reimbursements;

   e. marketing and web site management;

   f. staff training;

   g. computer systems and software updates;

   h. renovations and improvements in the facilities;

   i. patient and insurance billing;

   j. managing the finances and bank accounts for the Dental Practices, including making payments to vendors, adjudication of bank accounts, deposits of cash and checks, and credit-card payments;

   k. ensuring that the Dental Practices were in good standing with state licensing agencies and for paying all tax liabilities, updating the legal status of the Dental Practices yearly, and timely yearly tax filings.

25. In short, the Management Company provided all services for the Dental Practices other than direct dental care to patients.

4

26. The Management Company was funded by payments from dental practices under its management.

27. Depending on gross receipts, the Management Company received 5% to 10% of the monthly revenue of the Dental Practices.

28. As officers and executives of the Management Company, Lenny and Larry held and exercised broad power over the management and operation of the Management Company.

29. In their positions as executives and officers of the Management Company, Larry and Lenny oversaw and controlled all functions of the company, including business bank accounts and bank transactions for both the Management Company and the Dental Practices under its management.

30. Larry's duties included handling incoming and outgoing funds, as well as financial bookkeeping duties.

31. The Management Company and Dental Practices maintained business accounts with the Bank, which included the following accounts:

      a. ACCT# ███5001 – Beverly Shores Smile Center

      b. ACCT# ███3301 – River West Smile Center

      c. ACCT# ███2101 – All Family Dental

      d. ACCT# ███5501 – Oral Kare II

      e. ACCT# ███7201 – Glen Flora

      f. ACCT# ███8004 – Dental Practice Development

      g. ACCT# ███8001 – Dental Practice Development

32. As a client relations manager for the Bank, Mikki was responsible for and was involved in the financial maintenance of the accounts in coordination with Larry and Lenny.

33. Through their positions as officers and executives of the Management Company and manager at the Bank, respectively, Larry, Lenny, and Mikki oversaw and had control over the financial affairs of the Management Company through accounts of the Management Company and Dental Practices maintained at the Bank.

34. In addition, Larry, Lenny, and Mikki oversaw and had control over at least one other secret account at the Bank that was, unbeknownst to Li and Zehak and without their authorization, opened on an unknown date in the name of River West on which Larry was the only authorized signatory.

## The Scheme

35. Li and Zehak entrusted all banking, financial, and bookkeeping functions related to the Management Company and Dental Practices to Larry and Lenny.

36. On an unknown date around or prior to January 2010, Larry and Lenny, with the assistance of Mikki and the Bank, formulated a scheme to defraud the Dental Practices and Management Company.

37. The purpose of the scheme was to obtain money belonging to the Management Company and Dental Practices for the benefit of Larry, Lenny, and the Bank.

38. In furtherance of the scheme, Larry and Lenny used their authority as executives and managers of the Management Company to divert money from the Management Company's and Dental Practices' business accounts at the Bank to

themselves, family members, and personal expenses and debts.

39. Larry and Lenny worked with Mikki and the Bank to execute the scheme and conceal the existence of the scheme from Li and Zehak.

40. While handling the accounts at the Bank, Larry worked with Mikki, who was the Bank's customer-relations liaison for the Management Company and Dental Practices.

41. As a customer-relations manager for the Bank, Mikki's job responsibilities included managing or supervising the transactions and other business activities for the accounts owned by the Dental Practices and the Management Company at the Bank.

42. In furtherance of her responsibilities as customer-relations manager and as part of her involvement in the oversight and financial management of the accounts, Mikki personally installed a Bank-owned and -issued remote check scanner at one or more of the Dental Practices.

43. The remote check scanners were used to remotely deposit checks from the Dental Practices to accounts at the Bank.

44. Additionally, on at least one occasion while at Beverly Shore on Bank business, Mikki informed a Beverly Shore employee that she could take receipt of cash deposits from Beverly Shore in person.

45. The diversion of funds by Larry and Lenny frequently resulted in bills for the Dental Practices and Management Company not being paid.

46. To conceal the cash-flow problems caused by the diversion of funds from the

business accounts and prevent the scheme from being discovered, Larry coordinated with Mikki about which checks and outgoing payments to honor, and which checks not to honor.

47. In furtherance of the scheme, on a near daily basis Mikki called, reached out to, or otherwise coordinated with Larry on behalf of the Bank regarding which overdrawn checks she would clear or authorize for the Bank to honor and pay and which not to.

48. Mikki carried out Larry's instructions and ensured that the Bank honored the checks identified by Larry and rejected for insufficient funds (NSF) the checks that Larry told her to.

49. Each time that a check was rejected NSF, the Bank charged a NSF fee to the Dental Practices and Management Company, which was income to the Bank.

50. The checks that the Bank honored pursuant to Larry's instructions and with Mikki's assistance were for Larry's and Lenny's personal expenses, as well as for a Mercedes, for college tuition, for Larry's children, and his creditors.

51. Larry prioritized checks for his personal accounts above all else in his instructions to Mikki, along with payments that needed to be made to keep the business going in order not to expose the existence of the scheme.

52. Mikki could visibly see the gross amount of overdraft fees when reviewing account transactions to find the checks Larry wanted to be honored.

53. Mikki knew each time she reviewed the account transactions at Larry's direction which check would bounce and incur overdraft fees.

54. In addition to near-daily coordination with Mikki regarding which checks to hold and which to process on the accounts of the Dental Practices and Management Company, Larry also coordinated with other Bank account representatives on transactions the accounts, including but not limited to Ursula Czop.

55. As customer-relations liaison of the Bank and in coordination with Larry, Mikki continued to control the accounts of the Dental Practices and the Management Company, deciding which checks were paid, and which checks would trigger an NSF.

56. The Bank was aware of the unusually large volume of NSF checks and fees being charged to the accounts of the Management Company and Dental Practices.

57. The Bank received daily reports of overdrafts/NSF, which were reviewed by senior Bank executives.

58. In addition to receiving reports on the overdrafts/NSF for each of the accounts owned by the Dental Practices and Management Company, senior Bank executives and other employees spent a tremendous amount of time servicing the accounts on a daily basis.

59. Contrary to regulatory requirements that require overdrafts to be honored or rejected in an impartial manner, Bank employees including Mikki made the decisions on which overdrafts/NSF to pay and which to reject.

60. Whenever the Bank paid or honored an overdraft, the Bank used its own general funds to cover the overdraft as a loan to the account holder and automatically charged an overdraft/NSF fee to the account holder.

61. Overdraft/NSF fees are income to the Bank.

62. Bonuses received by Bank employees were related to or influenced by the amount of Bank income generated by overdraft/NSF fees.

63. Federal regulations require banks to mitigate the risks associated with automated overdraft payment programs and comply with all consumer protection laws and regulations, including providing clear and meaningful disclosures and other communications about overdraft payment programs, fees, and other features and options.

64. Federal regulations require banks to

   a. Promptly honor customers' requests to decline coverage of overdrafts (i.e., opt-out) resulting from non-electronic transactions;

   b. Give consumers the opportunity to affirmatively choose the overdraft payment product that overall best meets their needs;

   c. Monitor accounts and take meaningful and effective action to limit use by customers as a form of short-term, high-cost credit, including, for example, giving customers who overdraw their accounts on more than six occasions where a fee is charged in a rolling twelve-month period a reasonable opportunity to choose a less costly alternative and decide whether to continue with fee-based overdraft coverage;

   d. Institute appropriate daily limits on overdraft fees; and consider eliminating overdraft fees for transactions that overdraw an account by a de minimis amount; and

   e. Not process transactions in a manner designed to maximize the cost to

consumers.

65. Meaningful and effective follow-up with account owners for excessive or chronic overdrafts means that the institution must make reasonable efforts to provide the customer with information on alternatives to overdraft payment programs that may be better-suited to the customer's need for short-term credit, as well as a clear mechanism for customers to avail themselves of those alternatives.

66. Recognized methods of meaningful and effective follow up are:

    a. *Enhanced periodic statements* involve augmenting existing, required disclosures for overdraft fees under federal regulations, which requires disclosure of the total amounts of fees charged for overdrafts during the statement period and calendar year-to-date, by prominently highlighting how excessive or chronic users of automated overdraft programs could contact the institution to discuss available alternatives, and encouraging meaningful and effective contact.

    b. *Targeted outreach approach* involves contacting excessive users in person or via telephone to discuss less costly alternatives to automated overdraft payment programs.

67. Despite its obligations under federal regulations, in furtherance of the scheme the Bank deliberately concealed the existence of the scheme by not providing meaningful and effective follow up regarding the excessive and chronic NSF problem with the accounts, which would have alerted Li and Zehak, the owners of the Dental Practices and Management company, to the existence of the scheme.

### Use of Interstate Wire Communications

68. In furtherance of the scheme, Defendants caused the transmission of wire communications in interstate commerce.

69. Checks written to the Dental Practices or Management Company were scanned via the Bank's remote check scanner installed by Mikki at one or more locations and transmitted via wire communications to the Bank for deposit in accounts held at the Bank.

70. Checks written or caused to be written by Lenny or Larry in furtherance of the scheme were drawn on accounts held by the Bank and deposited by the payees into other banks.

71. No later than 11:59:59 on the day of deposit, the recipient banks electronically sent the checks to the Federal Reserve Bank for clearing.

72. The Federal Reserve Bank cleared the checks and electronically sent the recipient banks and the Bank a list of all checks that did not clear and are NSF.

### The Pattern of Racketeering

73. In furtherance of the scheme, between January 2010 and June 2016, Defendants executed or caused to be executed more than an estimated 4,000 separate checking and NSF transactions.

74. Between about June 2010 and June 2016, when the scheme was discovered by Li and Zehak, the fraudulent transactions resulted in an estimated $4,427,117.27 in losses to the Dental Practices and Management Company, including but not limited to the following:

12

    a. Larry directly obtained at least $618,027.98.

    b. Lenny obtained at least $42,854.00.

    c. An estimated $685,433.40 used to pay American Express accounts in Larry's name.

    d. $67,425.85 used to pay for a Mercedes automobile purchased in Larry's name.

    e. $273,558.36 used to pay for a Citi Card account in Larry's name.

75. Further, Larry transferred or paid out funds from accounts owned by the Dental Practices and Management Company accounts to accounts Larry possessed with Barton Oaks, Harris Bank, Capital One, Chase, Shell Commercial, Allstate Insurance, AT&T, Blue Cross, Catholic Foresters, Commonwealth Edison, Elite Client, End of the Road, Fey and Company, BMW, Prudential, Sears, Silver Lake Dental, Verizon, Village of LaGrange, and others.

76. Funds from accounts owned by the Dental Practices and Management Company were given or paid to Karen Kelliher and Colin Kelliher, who are relatives of Larry.

77. Specifically, between 2010 and 2016, the scheme involved the following fraudulent wire transactions:

    a. $1,500,152.22 in fraudulent transactions from Beverly Shores, Account No. ▆▆▆5001. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 2 (itemized transactions for Beverly Shores).

    b. $734,651.03 in fraudulent transactions from River West, Account No.

████3301. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 3 (itemized transactions for River West).

c. $154,692.73 in fraudulent transactions from All Family, Account No. ████2101. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 4 (itemized transactions for All Family).

d. $352,221.12 in fraudulent transactions from Oral Kare II, Account No. ████5501. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 5 (itemized transactions for Oral Kare II).

e. $42,672.59 in fraudulent transactions from Glen Flora, Account No. ████7201. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 6 (itemized transactions for Glen Flora).

f. $466,713.40 in fraudulent transactions from Dental Practice Development, Account No. ████8001. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 7 (itemized transactions for Dental Practice Development).

78. Further, because of NSF transactions in furtherance of the scheme, the Dental Practices and Management Company incurred at least $339,622.90 in overdraft/NSF fees that were paid to the Bank as income between January 2010 and June 2016. *See* Exhibit 1 (summary of fees and transactions).

79. Specifically, the wire transactions made or caused to be made by Defendants in furtherance of the scheme resulted in the following fees paid to the Bank:

a. $92,081.50 in fees on the account owned by Beverly Shores. *See* Exhibit

1 (summary of fees and transactions); *see also* Exhibit 8 (itemized bank fees for Beverly Shores, Account No. ▮▮▮▮ 5001).

b. $97,389.50 in fees on the account owned by River West. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 9 (itemized bank fees for River West, Account No. ▮▮▮▮ 3301).

c. $37,846.90 in fees on the account owned by All Family. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 10 (itemized bank fees for All Family, Account No. ▮▮▮▮ 2101).

d. $45,851.00 in fees on the account owned by Oral Kare II. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 11 (itemized bank fees for Oral Kare II, Account No. ▮▮▮▮ 5501);

e. $17,990.00 in fees on the account owned by Glen Flora. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 12 (itemized bank fees for Glen Flora, Account No. ▮▮▮▮ 7201).

f. $300 and $48,134.00 in fees, respectively, on the two accounts owned by Dental Practice Development. *See* Exhibit 1 (summary of fees and transactions); *see also* Exhibit 13 (itemized bank fees for Dental Practice Development, Account No. ▮▮▮▮ 8004), Exhibit 14 (itemized bank fees for Dental Practice Development, Account No. ▮▮▮▮ 8001).

80. In addition to the diversion of funds by Larry and Lenny and the NSF fees paid to the Bank, Larry's actions in furtherance of the scheme resulted in delinquencies by the Dental Practices and Management Company to the Internal Revenue, Illinois

Department of Revenue, and Illinois Department of Employment Security in excess of $420,000.

### Diversion of cash receipts

81. As part of his duties as an officer of the Management Company, Larry received and was entrusted with cash received by each of the Dental Practices for deposit with the Bank into the proper accounts held by the Dental Practices.

82. Between 2013 and 2016, Larry diverted $271,532.89 of cash receipts from Glen Flora, Oral Kare II, River West, and Beverly Shore.

83. Specifically, Larry took possession of, failed to properly deposit, and diverted to his own use the following amounts:

a. $57.568.65 from Glen Flora between September 1, 2013, and June 30, 2016;

b. $45,312.47 from Oral Kare II between February 26, 2013, and June 30, 2016;

c. $57,156.58 from River West between May 9, 2013, and June 30, 2016;

d. $111,495.19 from Beverly Shore between July 1, 2013, and June 30, 2016.

### COUNT I
### Racketeering in violation of 18 U.S.C. 1962(c)

84. This count is alleged against Defendants First Eagle Bank, Larry Kelliher, Mikki Francione, and Lenny Vihnanek.

85. 18 U.S.C. 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

16

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

86. 18 U.S.C. 1964(c) authorizes any person injured in their business or property to pursue private civil remedies for violations of section 1962.

87. The Management Company, Dental Practice Development Ltd., was an enterprise whose activities affected interstate commerce.

88. Defendants Larry Kelliher and Lenny Vihnanek were employed by the enterprise, Dental Practice Development Ltd., in executive positions that gave them control over the management and operations of the enterprise.

89. Defendants Mikki Francione and First Eagle Bank were associated with the enterprise, Dental Practice Development Ltd., through their management and oversight of the enterprise's business accounts and financial activities at the Bank.

90. Each of the Defendants conducted or participated in the conduct of the enterprise's financial affairs through a pattern of racketeering activity, specifically wire fraud, against Plaintiffs.

91. Defendants committed acts of wire fraud by using interstate wire communications between banks to complete check transactions in furtherance of the scheme to divert monies owned by the Management Company and Dental Practices.

92. The pattern of predicate acts of wire fraud began in or around January 2010 and continued until at least June 2016, and included but was not limited to at least 4,000 separate transactions in furtherance of the scheme. *See* Exhibits 1 through 14.

93. Because of Defendants' violation of section 1962(c), Plaintiffs have collectively incurred over $4.7 million in damages. *See* Exhibits 1 through 14.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order granting them the following relief:

- Treble compensatory damages;

- Punitive damages to the extent permitted by law;

- Attorney fees and costs;

- Any other relief permitted by law or equity.

## Count II
### Conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d)

94. This count is alleged against Defendants First Eagle Bank, Larry Kelliher, Mikki Francione, and Lenny Vihnanek.

95. 18 U.S.C. § 1962(d) makes it unlawful for any person to conspire to violate 18 U.S.C. § 1962(c).

96. 18 U.S.C. 1964(c) authorizes any person injured in their business or property to pursue private civil remedies for violations of section 1962.

97. Beginning on an unknown date and continuing through at least June 2016, Defendants entered into an agreement to violate 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the affairs of an enterprise, Dental Practice Development Ltd., through a pattern of racketeering activity, specifically wire fraud, against Plaintiffs.

98. In furtherance of the conspiracy, Defendants Larry Kelliher and Lenny Vihnanek used their executive positions in the enterprise to directly and indirectly

convert funds belonging to Plaintiffs by writing checks to themselves and for their benefit, and to conceal the conversions by working with Defendants Mikki Francione and First Eagle Bank through manipulation of the NSF process, failure to report NSFs to Plaintiffs, and conversion of further funds belonging to Plaintiffs to the benefit of the Bank through the NSF process.

99. Because of Defendants' violation of section 1962(d), Plaintiffs have collectively incurred at least $4.7 million in damages. *See* Exhibits 1 through 14.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order granting them the following relief:

- Treble compensatory damages;

- Punitive damages to the extent permitted by law;

- Attorney fees and costs;

- Any other relief permitted by law or equity.

### Count III
### Breach of fiduciary duty

100. This count is alleged against Defendants First Eagle Bank, Larry Kelliher, Mikki Francione, and Lenny Vihnanek.

101. Defendants Larry Kelliher and Lenny Vihnanek held managerial and executive positions in Plaintiff Dental Practice Development Ltd., through which they exercised managerial control over Plaintiffs' financial and business affairs.

102. Defendant Mikki Francione exercised control over Plaintiffs' financial and business affairs through her position as client relations manager at Defendant First Eagle Bank.

103.    The positions held by Larry, Lenny, and Mikki were positions of trust giving rise to a fiduciary relationship with Plaintiffs.

104.    Larry, Lenny, and Mikki breached their fiduciary duties to Plaintiffs by misappropriating and converting Plaintiffs' money and by causing Plaintiffs' to incur and failing to notify Plaintiffs' of NSF checks.

105.    At all relevant times, Mikki acted as an agent of the Bank within the scope of her employment.

106.    The Bank knew that Larry, Lenny, and Mikki were engaged in a breach of their fiduciary obligations to Plaintiffs by engaging in a scheme to divert money from Plaintiffs' accounts, and was aware that Larry and Lenny were in breach of their fiduciary duties to Plaintiffs by drawing checks on Plaintiffs' accounts in furtherance of the scheme.

107.    Because of the Bank's actual knowledge of Larry, Lenny, and Mikki's breach of their fiduciary duties and bad-faith payment of the checks involved in the scheme, the Bank is also liable for Larry, Lenny, and Mikki's breach pursuant to section 8 of the Illinois Fiduciary Obligations Act (760 ILCS 65/8).

108.    The breach by Larry, Lenny, and Mikki and the Bank's bad faith caused Plaintiffs to collectively incur in excess of $4.7 million in damages. *See* Exhibits 1 through 14.

Wherefore, Plaintiffs pray that this Honorable Court grant relief and order Defendants to compensate Plaintiffs for their damages plus costs, interest and attorney's fees, as well as any other relief authorized by law or equity.

## Count IV
## Conversion

109.     This count is alleged against Defendants Larry Kelliher and Lenny Vihnanek.

110.     Larry and Lenny misappropriated monies from the accounts of Plaintiffs while knowing that only Plaintiffs had a right to such funds.

111.     Larry and Lenny took these funds and directed them for their own use and enjoyment.

112.     Over the course of the six-year scheme, Larry wrote hundreds of checks to himself, his family, to his personal creditors, and to Lenny from the accounts of Plaintiffs without the knowledge and permission of Plaintiffs, and diverted cash receipts to himself.

113.     Plaintiffs have demanded the return of the monies.

114.     Larry and Lenny have not complied with such demand.

WHEREFORE, Plaintiffs pray that this Honorable Court grant relief and order Larry and Lenny compensate Plaintiffs for their damages plus costs, interest, and attorney's fees, as well as any other relief allowed by law or equity.

## Count V
## Negligence

115.     This count is alleged against Defendant First Eagle Bank.

116.     The Bank owed a duty of care in operating and overseeing the accounts maintained by Plaintiffs with the Bank.

117.     The Bank knew or reasonably should have known that Larry and Lenny,

with the assistance of the Bank's employee and agent Mikki, were engaged in a scheme to unlawfully divert funds from Plaintiffs' accounts.

118. The Bank knew or reasonably should have known that the accounts of Plaintiffs were incurring overdraft fees at an abnormal and unsustainable rate.

119. The Bank's duty of care included a duty to undertake meaningful and effective follow up on accounts under its supervision that exhibit signs of excessive or chronic overdrafts.

120. The Bank breached its duty of care by willfully ignoring Larry and Lenny's unlawful diversion of funds from Plaintiffs accounts and by failing to provide meaningful and effective follow up on the excessive and chronic overdrafts on Plaintiffs' accounts.

121. The Bank's breach of its duty of care proximately caused Plaintiffs to incur in excess of $4.7 million in damages. *See* Exhibits 1 through 14.

WHEREFORE, Plaintiffs pray that this Honorable Court grant relief and order the Bank to compensate Plaintiffs for their damages plus costs, interest, and attorney's fees, as well as any other relief allowed by law or equity.

## Jury Demand

122. Plaintiffs demand trial by jury on all claims to which they are entitled by law.

Respectfully Submitted,

/s/ James G. Vanzant

_____

Attorney for Plaintiffs

Michael Ettinger, Esq.
Alexander Michael, Esq.
ETTINGER & BESBEKOS, P.C.
12413 S. Harlem, Suite 203
Palos Heights, Illinois 60463
Tel.: (708) 923-0368
Email: craignor@me.com
Email: amichaellaw1@gmail.com

James G. Vanzant, Esq.
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
Email: jgv@blainevanzant.com

John Downey, Esq.
JOHN J. DOWNEY, P.C.
15 Salt Creek Lane, Suite 321
Hinsdale, Illinois 60521
Tel.: (630) 323-1605
Email: Johndowneylaw@yahoo.com