## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GLEN FLORA DENTAL CENTER, LTD.,
et al.,

               Plaintiffs,

               v.

FIRST EAGLE BANK, et al.,

               Defendants.

Case No. 17-cv-9161

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiffs—five related dental practices and their business management service, Dental Practice Development (DPD)—allege that two DPD managers worked with agents of Defendant First Eagle Bank to defraud the practices out of more than $4 million. Plaintiffs sued Defendants for violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.* (Count I), and conspiracy to violate the RICO Act (Count II). Plaintiffs also assert state-law claims for breach of fiduciary duty (Count III), conversion (Count IV), and negligence (Count V). All Defendants moved to dismiss Plaintiffs' complaint. [24, 28, 31, 40]. For the reasons explained below, this Court grants their motions, and grants Plaintiffs leave to replead their claims.

## I.    The Complaint's Allegations

### A.    The Parties

Plaintiffs Glen Flora Dental Center, River West Smile Center, Oral Kare

Network II, All Family Dental, and Beverly Shores Smile Center (the Practices) are dental practices in the Chicago area owned by William Li, a dentist. [1] ¶¶ 3–7, 14. Plaintiff DPD provided management services to the Practices. *Id.* ¶¶ 8, 15. Li owned DPD with George Zehak, another dentist. *Id.* ¶¶ 16, 18. DPD provided all business and financial services for the Practices, including hiring staff, negotiating contracts and leases, and managing the Practices' payrolls, bank accounts, and general finances. *Id.* ¶¶ 24–25. DPD received its funding as a percentage of the monthly revenue of the Practices. *Id.* ¶¶ 26–27.

Defendant Lenny Vihnanek served as DPD's President from 1995 to 2012. *Id.* ¶ 13. Vihnanek brought on Larry Kelliher, a friend of his, as an officer of DPD in 1996. *Id.* ¶¶ 19–22. Kelliher held a number of executive positions in DPD, including Chief Financial Officer and ultimately President. *Id.* ¶ 23. In these positions, Vihnanek and Kelliher "oversaw and controlled" all of DPD's functions, including managing the bank accounts and financial transactions of both DPD and the Practices. *Id.* ¶¶ 28–29, 35. Kelliher also handled bookkeeping duties. *Id.* ¶ 30. DPD and the Practices held at least seven business accounts with Defendant First Eagle Bank (the Bank). *Id.* ¶ 31.

Defendant Mikki Francione worked for First Eagle Bank as a client relationship manager. *Id.* ¶¶ 11, 32. She helped manage the accounts held by DPD and the Practices, including by supervising their transactions. *Id.* ¶¶ 32, 41. She is also Vihnanek's sister-in-law. *Id.* ¶ 10. According to Plaintiffs, as a result of this relationship, Vihnanek, Kelliher, and Francione "oversaw and had control over the

2

financial affairs" of DPD. *Id.* ¶ 33. Plaintiffs also allege that the three collectively controlled "at least one other secret account at the Bank," opened in the name of River West Smile Center without Li's or Zehak's knowledge. *Id.* ¶ 34.

### B. The Alleged Scheme

Beginning around January 2010, Vihnanek and Kelliher—allegedly with assistance from Francione and the Bank—contrived a scheme to defraud Plaintiffs by diverting money from their business accounts to benefit Vihnanek, Kelliher, and the Bank. *Id.* ¶¶ 35–39. Because this scheme depleted the funds in Plaintiffs' accounts, bills incurred by DPD and the Practices often went unpaid. *Id.* ¶ 45.

To conceal such problems, Kelliher coordinated with Francione on a near-daily basis about which checks and payments from Plaintiffs the Bank should honor. *Id.* ¶¶ 46–47. Francione "carried out" Kelliher's "instructions" as to which checks to honor and which to reject for insufficient funds (NSF). *Id.* ¶ 48.[1] Any time a check was rejected as NSF, the Bank charged Plaintiffs a fee. *Id.* ¶ 49.

According to Plaintiffs, many of the checks the Bank honored formed part of Defendants' scheme, and went toward Vihnanek and Kelliher's personal expenses, including a Mercedes, college tuition for Kelliher's children, and payments to their personal creditors. *Id.* ¶ 50. But Kelliher made sufficient payments on Plaintiffs' legitimate expenses to keep the businesses afloat and conceal the scheme. *Id.* ¶ 51.

---

[1] Ostensibly, Plaintiffs contradict this statement elsewhere in their complaint, alleging that as a client relations manager, Francione "continued to control" Plaintiffs' accounts, "deciding which checks were paid, and which checks would trigger an NSF." *Id.* ¶ 55; *see also id.* ¶ 59.

Beyond the alleged coordination discussed above, Francione's participation in the scheme consisted of various banking services. At some point, Francione "personally installed" a remote check scanner, owned and issued by the Bank, at one or more of the Practices. *Id.* ¶ 42. The scanner facilitated remote check deposits from the Practices to their accounts at the Bank. *Id.* ¶ 43. On at least one occasion, Francione told a Beverly Shore employee that she could "take receipt of cash deposits from Beverly Shore in person." *Id.* ¶ 44. Francione also knew the details of the overdraft fees incurred by Plaintiffs' accounts. *Id.* ¶¶ 52–53.

As to the Bank, Plaintiffs allege that Kelliher coordinated with other Bank representatives, including Ursula Czop, about certain transactions. *Id.* ¶ 54. Plaintiffs claim that the Bank knew about the "unusually large volume of NSF checks" and subsequent fees charged to Plaintiffs through daily overdraft reports reviewed by Bank executives. *Id.* ¶¶ 56–57. Plaintiffs also allege that "senior Bank executives and other employees" spent significant time on daily account servicing. *Id.* ¶ 58. Overdraft fees represent income for the Bank, and Bank employees received bonuses influenced by the amount of such income that employees generated. *Id.* ¶ 62. Certain federal regulations require banks to mitigate the risks of harm arising from overdraft payment programs, and include recommendations for transparency measures and follow-up steps for Banks to implement. *See id.* ¶¶ 63–66. Plaintiffs assert that the Bank disregarded such regulations and failed to effectively follow up on the chronic NSF problems associated with Plaintiffs' accounts. *Id.* ¶ 67.

Finally, Plaintiffs assert that the transactions that formed part of Defendants' alleged scheme constituted interstate wire communications because: 1) the Bank's remote check scanner transmitted deposits to the Bank; 2) Vihnanek and Kelliher wrote checks in furtherance of the scheme that drew on the accounts held by the Bank and deposited those funds in other banks; and 3) the recipient banks send such checks to "the Federal Reserve Bank" for clearing. *Id*. ¶¶ 68–72.

Beyond this scheme allegedly coordinated among all four Defendants, Plaintiffs claim that Kelliher took advantage of his position managing the Practices' cash receipts to divert over $200,000 in cash from DPD and the Practices for his own use and profit. *See id*. ¶¶ 81–83. Plaintiffs do not explain how or whether this particular conduct relates to the broader scheme.

## C. The Pattern

Plaintiffs allege that between January 2010 and June 2016, when Li and Zehak discovered the scheme, Defendants executed or directed around 4,000 separate transactions in furtherance of their scheme, causing an estimated $4,427,117.27 of losses to DPD and the Practices. *Id*. ¶¶ 73–74. These transactions included the following payments:

- $618,027.98 to Kelliher;
- $42,854.00 to Vihnanek;
- $685,433.40 to pay off American Express accounts in Kelliher's name;
- $67,425.85 for a Mercedes purchased in Kelliher's name;
- $273,558.36 to pay off a Citi Card account in Kelliher's name;
- unspecified transfers to accounts Kelliher possessed with various other banks, vendors, and insurance companies; and
- unspecified payments to relatives of Larry Kelliher.

5

*Id.* ¶¶ 74–76.  Plaintiffs also break down the total amount of fraudulent transaction by account number, *id.* ¶ 77, and note that the Bank received at least $339,622.90 in overdraft fees, *id.* ¶¶ 78–79.  Finally, the scheme caused DPD and the Practices to incur delinquencies with the Internal Revenue Service, the Illinois Department of Revenue, and the Illinois Department of Employment Security, in amounts exceeding $420,000.  *Id.* ¶ 80.

### D.    This Case

Plaintiffs state that they discovered the scheme in June 2016.  *Id.* ¶ 74.  They filed this suit in December 2017.  [1].  In early 2018, all Defendants moved to dismiss Plaintiffs' complaint.  [24, 28, 31, 40].  This opinion addresses each of the pending motions.

## II.    Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted."  *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).  To survive a motion to dismiss, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), giving the defendant "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint must also contain "sufficient factual matter" to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating a complaint, this Court accepts all well-pled allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But this Court need not accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Claims alleging fraud must also meet Rule 9(b)'s heightened pleading requirements. Rule 9(b) demands that claimants "state with particularity the circumstances constituting fraud." Particularity requires that plaintiffs "describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal quotation marks omitted). Although different cases require different levels of detail for a complaint to satisfy Rule 9(b), *id.* at 442, plaintiffs must provide "precision and some measure of substantiation," *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal quotation marks omitted).

## III.  Analysis

### A.  RICO Claims

The RICO Act permits private civil plaintiffs to sue under § 1964(c) for

7

violations of the statute that proximately damage the plaintiff's business or property. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–68 (1992). Here, Plaintiffs allege both a substantive RICO violation under § 1962(c) (Count I) and a RICO conspiracy violation under § 1962(d) (Count II). [1] at 16, 18.

Under § 1962(c), RICO prohibits any "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Thus, to establish a violation of § 1962(c), Plaintiffs must allege: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Sedima*, *S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Here, the parties do not dispute the second element: Plaintiffs allege that DPD comprises the enterprise, as stated in open court on July 12, 2018.

Because § 1962(d) prohibits conspiring to violate subsections (a), (b) and (c) of § 1962, the overall objective of the RICO conspiracy claim often mirrors the underlying RICO substantive claim. This case is no exception. *See* [1] at 18–19. Thus, as to § 1962(d), Plaintiffs must show that each Defendant agreed to participate in "an endeavor which, if completed, would satisfy all of the elements" of a substantive RICO violation—here, the elements of the § 1962(c) offense noted above. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir. 2000).

In moving to dismiss Counts I and II, Defendants argue that Plaintiffs have insufficiently alleged the predicate racketeering acts of wire fraud, a pattern of

8

racketeering, and an agreement supporting Plaintiffs' conspiracy claim. *See* [32] at 4, 6, 12; [37] at 16, 19; [38] at 18; [40] at 4–5. Francione and the Bank also contend that Plaintiffs fail to show their personal participation in any RICO enterprise or conspiracy. [37] at 10, 13, 14, 20; [38] at 14, 16, 22. This Court first addresses Defendants' arguments challenging Plaintiffs' overarching RICO allegations.

### 1. Predicate Acts: Wire Fraud

To establish their substantive RICO claim, Plaintiffs must show a pattern of racketeering activity, which "consists, at the very least, of two predicate acts of racketeering committed within a ten-year period." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). Here, Plaintiffs allege the predicate act of wire fraud, [1] ¶ 90, and must plead that portion of the claim with sufficient particularity to satisfy the requirements of Rule 9(b), *see Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726, 729 (7th Cir. 1998); *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 684 (N.D. Ill. 2012). Rule 9(b) requires plaintiffs to "allege 'the who, what, when, where, and how' of the alleged fraud." *Guaranteed Rate*, 912 F. Supp. 2d at 684 (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012)).

Additionally, civil RICO liability for a substantive violation only covers individuals who have "personally committed" at least two predicate racketeering acts. *Id.* Thus, Plaintiffs must "at a minimum, describe two predicate acts of fraud by each RICO Defendant with some specificity and state the time, place and content of the alleged communications perpetrating the fraud, the method by which the

misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Id.* (citing *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999)). This standard assumes particular importance where, as here, the predicate fraud provides "the only link to federal jurisdiction." *See id.*

Plaintiffs fall short of that standard. To state a claim for wire fraud, Plaintiffs must allege, with particularity: (1) a scheme to defraud; (2) intent to defraud; and (3) the use of wire communications in furtherance of the scheme. *See Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1099–1100 (N.D. Ill. 2016). Wire fraud also requires showing an interstate communication. *See Meier v. Musburger*, 588 F. Supp. 2d 883, 907 (N.D. Ill. 2008) (collecting cases). Plaintiffs fail to demonstrate any of these elements with the requisite particularity.

The scheme to defraud depicted in Plaintiffs' complaint remains vague at best. According to Plaintiffs, Vihnanek and Kelliher diverted money from Plaintiffs' business accounts at the Bank for their personal benefit, and "worked with" Francione and the Bank to "execute the scheme" and conceal its existence from Li and Zehak. *See* [1] ¶¶ 36–40. Plaintiffs also allege that Defendants collectively "executed or caused to be executed" over 4,000 transactions in furtherance of the scheme. *Id.* ¶ 73. Such general allegations cannot satisfy Rule 9(b). Although Plaintiffs specify some of the amounts transferred and the accounts that Defendants allegedly drained, *see id.* ¶¶ 74–78, Plaintiffs never connect an individual Defendant to any specific transaction, describe how Defendants carried them out, or identify the

10

steps any Defendant took to further or conceal the scheme. Thus, Plaintiffs fall short of explaining "the who, what, when, where, and how" of the alleged wire fraud, and fail to offer "sufficient facts to notify each defendant" of his or her alleged participation in the scheme. *Guaranteed Rate*, 912 F. Supp. 2d at 684 (internal quotation marks omitted).

True, Plaintiffs attach numerous spreadsheets containing the allegedly fraudulent transactions related to the Practices' accounts. *See, e.g.*, [1-1]. But Plaintiffs fail to explain these transactions, specify which Defendant authorized or executed them, or otherwise detail how these hundreds of debits and credits relate to the overall scheme to defraud.

Further, Plaintiffs fail to allege an interstate wire communication. Plaintiffs imply that any checks written by Kelliher or Vihnanek crossed state lines because the recipient bank would have transmitted the checks to "the Federal Reserve Bank for clearing." [1] ¶ 71. But the Federal Reserve consists of 12 regional Reserve Banks, including one in Chicago. *See* Federal Reserve Bank, *Structure of the Federal Reserve System*, www.federalreserve.gov/aboutthefed/structure-federal-reserve-banks.htm (last accessed July 19, 2018).[2] Thus, this Court has no basis to conclude that any checks transmitted as part of Defendants' alleged scheme must have passed through

---

[2] This Court may take "judicial notice of public records and government documents, including those available from reliable sources on the Internet." *Sleeter v. Actavis Totowa, LLC*, No. 10-653-GPM, 2010 WL 3781261, at *2 n.1 (S.D. Ill. Sept. 21, 2010) (citing *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002)).

out-of-state Reserve Banks rather than the Chicago bank, or, indeed, that any part of the alleged scheme crossed state lines.

Accordingly, Plaintiffs fail to plead the predicate acts of wire fraud with sufficient particularity. They therefore fail to establish the pattern element of their substantive RICO claim. *See Jennings*, 495 F.3d at 472.

### 2. RICO Pattern: Continuity

Although their failure to plead wire fraud suffices to dismiss Plaintiffs' substantive RICO claim, Plaintiffs will be given an opportunity to amend and, in doing so, must satisfy the remaining requirements of a RICO pattern. Accordingly, this Court addresses the relevant issues below.

Beyond pleading the requisite predicate acts, showing a pattern of racketeering activity requires that plaintiffs satisfy the "continuity plus relationship" test: that is, Plaintiffs must show that the predicate acts relate to each other and present a "threat of continuity." *Menzies*, 197 F. Supp. 3d at 1095–96 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236-50 (1989)). None of the parties here contest the relationship prong of this test, so this Court considers only whether Plaintiffs have sufficiently pled continuity.

To do so, Plaintiffs must show either "open-ended" continuity, meaning that the predicate acts "have no obvious termination point," or "closed-ended" continuity, meaning the acts have ceased but previously extended over "a substantial period" of time. *Id.* at 1096. A threat of continuity may also be inferred from "the character of the illegal enterprise" or "because the acts represent the regular way of doing

12

business of a lawful enterprise." *Id.*

In assessing either category, courts in this district have generally applied the traditional Rule 8 pleading standard to these non-fraud elements of RICO claims. *See Menzies*, 197 F. Supp. 3d at 1083.

### i. Closed-Ended Continuity

To determine whether a plaintiff has demonstrated closed-ended continuity, courts consider the following factors: "(1) the number and variety of predicate acts; (2) the length of time over which they were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries." *Guaranteed Rate*, 912 F. Supp. 2d at 689 (citing *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)). Of these factors, duration constitutes "the most important element." *Jennings*, 495 F.3d at 473–74.

Here, Plaintiffs offer numerous acts of wire fraud—Plaintiffs' spreadsheets itemize thousands of transactions allegedly in furtherance of Defendants' scheme— but each act is of the same type. This lack of variety among the predicate acts weighs against finding closed-ended continuity because, when it comes to wire fraud, the "volume" of transactions "is not dispositive." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992). In such cases, a "multiplicity of such acts may be no indication of the requisite continuity of the underlying fraudulent activity," and courts therefore do not "look favorably on many instances of mail and wire fraud to form a pattern." *Id.* at 1024–25. Thus, this factor cuts against finding continuity here.

13

Duration, by contrast, strongly favors Plaintiffs. Their complaint describes a scheme lasting from 2010 to 2016. [1] ¶ 74. Without doubt, six years represents "a substantial period" of time for RICO continuity. *See Morgan*, 804 F.2d at 976 (finding "a period of nearly four years" sufficient in light of distinct predicate acts); *Equity Residential v. Kendall Risk Mgmt.*, No. 04-c-3812, 2005 WL 1026686, at *8 (N.D. Ill. Apr. 12, 2005) (plaintiffs showed sufficient duration by alleging scheme spanning five years); *cf. Midwest Grinding*, 976 F.2d at 1024–25 (collecting cases showing that schemes spanning several months to "several years" often fail to show continuity). Although this factor weighs strongly in favor of finding continuity, no one factor is dispositive. *See Guaranteed Rate*, 912 F. Supp. 2d at 689–90 (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 663 (7th Cir. 1992)).

Next, the number of victims factor militates against finding closed-ended continuity. Contrary to Plaintiffs' assertion, DPD and the Practices constitute one victim for purposes of the RICO inquiry, since they consist of a defined class of closely-related entities owned and operated by the same two individuals. *See Elec. Replacement Serv. Inc. v. ITT Hartford Ins. Co.*, No. 95-c-1469, 1995 WL 560913, at *5 (N.D. Ill. Sept. 18, 1995) ("Courts treat related entities as a single victim for RICO purposes.") (citing *Hughes v. Consol-Penn. Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) (finding that a discrete, defined class of victims constituted a single victim for RICO purposes)).

Additionally, Plaintiffs admit that they allege only one scheme, but contend that a single scheme can support closed-ended continuity. *See* [64] at 31. True, but

14

the Seventh Circuit has generally upheld RICO claims based upon a single scheme only where the plaintiffs identified "multiple separate and distinct injuries," and thus the "threat of criminal activity 'continue[d] to manifest itself over time and thus pose[d] a special threat to society.'" *Meier*, 588 F. Supp. 2d at 903 (quoting *Morgan*, 804 F.2d at 978)). Such cases represent "an exception to the general rule." *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1279 (7th Cir. 1989) (sustaining the jury's finding of a RICO pattern based upon a single scheme where the case affected multiple victims and arose from a variety of predicate acts). Here, Plaintiffs' allegations present only one injury, to one victim, so in context, this factor does not favor continuity.

Finally, although Plaintiffs point to numerous transactions that allegedly furthered Defendants' scheme, each of these injuries "stemmed from a single scheme to defraud involving similar predicate acts." *Meyer Material Co. v. Mooshol*, 188 F. Supp. 2d 936, 943 (N.D. Ill. 2002). Such circumstances do not demonstrate "distinct" injuries but rather "cumulative" harms arising from a single decision to defraud Plaintiffs. *Id.*; *see also Menzies*, 197 F. Supp. 3d at 1099–1100 (noting that a "significant" number of transactions does not "mandate" finding a RICO pattern where the plaintiff alleges a single victim "whose injuries all flowed from a single scheme") (citing *U.S. Textiles Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1268–69 (7th Cir. 1990)).

In light of the above, Plaintiffs may wish to address with more detail the factual support for demonstrating closed-ended continuity in any amended

complaint.

### ii.     Open-Ended Continuity

To demonstrate open-ended continuity, Plaintiffs must show: (1) a "specific threat of repetition"; (2) that the predicate acts form "part of an ongoing entity's regular way of doing business"; or (3) that Defendants operate a "long term association that exists for criminal purposes." *Guaranteed Rate*, 912 F. Supp. 2d at 693 (quoting *Midwest Grinding*, 976 F.2d at 1023). Plaintiffs appear to focus their arguments on the first or second theory of continuity, contending that, but for Plaintiffs' discovery of the scheme, it would have continued indefinitely. *See* [64] at 22–26. The current version of the complaint, however, puts such a conclusion in doubt.

Although, as Plaintiffs note, the threat of continuity must be assessed as of "the time the racketeering occurred," *Inteliquent, Inc. v. Free Conferencing Corp.*, No. 16-cv-6976, 2017 WL 1196957, at *10 (N.D. Ill. Mar. 30, 2017), Plaintiffs allege facts indicating that Defendants' alleged scheme may either have come to an end or would soon have ended, even absent its discovery. When Plaintiffs discovered the scheme in June 2016, Vihnanek had long since departed DPD and Francione had retired from the Bank. *See* [1] ¶¶ 13, 74; [34] at 26. Did Kelliher carry on the scheme alone? If so, how? Did Francione and Vihnanek continue to participate from afar, and if so, in what way? The complaint provides no answer to such questions, and instead suggests that the alleged scheme may have come to a close. Other courts have found that when a RICO scheme depends upon a specific employment relationship, the end of that

16

relationship may eliminate any threat of repetition. *See Midwest Grinding*, 976 F.2d at 1025. As alleged here, two of the four Defendants had apparently exited the enterprise by June 2016 and Plaintiffs offer no factual allegations describing how or if the scheme would have continued without them. Plaintiffs' current complaint raises concerns that "a specific threat of repetition exists" or that the scheme is part of "a regular way of conducting an ongoing legitimate business." *Inteliquent*, 2017 WL 1196957, at *9–10; *Menzies*, 197 F. Supp. 3d at 1101; *see also U.S. Textiles*, 911 F.2d at 1269 (finding it "significant" to continuity analysis that the plaintiffs offered "no indication" of other victims "waiting in the wings").

### 3. Participation by Francione and the Bank

As to any attempt by Plaintiffs to amend their substantive RICO claims, this Court finds that, as to Francione and the Bank, the current complaint fails to plead facts that establish their participation in the enterprise.

Plaintiffs do not contend that Francione and the Bank managed the alleged enterprise—DPD—or came "under the direction" of the DPD's "upper management." *See* [64] at 10–11; *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 977 (7th Cir. 1995). Thus, under the test set out in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), Francione and the Bank constitute mere associates of the enterprise who must "exert control" over it to incur RICO liability, *see MCM Partners*, 62 F.3d at 977. The present allegations, however, do not show such control here.

True, Plaintiffs assert—briefly, and in conclusory terms—that Francione "continued to control the accounts" of the Plaintiffs. [1] ¶ 55. But Plaintiffs do not

17

offer factual allegations to support that assertion and often contradict it, including by stating that Vihnanek and Kelliher "oversaw and controlled" Plaintiffs' finances and account transactions, while Francione "carried out" Kelliher's instructions. *Id.* ¶¶ 29, 38, 48. Plaintiffs' current lack of factual detail and failure to offer any basis for their purported knowledge of Francione's "control" over DPD's activities falls short of the plausibility standard set by Rule 8. *See, e.g.*, *Mohammed v. Sidecar Techs. Inc.*, No. 16-c-2538, 2016 WL 6647946, at *7 (N.D. Ill. Nov. 10, 2016).

That failure assumes added importance where the few details Plaintiffs do provide about Francione's alleged participation in the enterprise fail to show any acts beyond ordinary banking services. For example, Plaintiffs note that Francione installed a remote check scanner at one of the Practices and coordinated with Kelliher about which overdrawn checks to honor. [1] ¶¶ 42, 47. Plaintiffs never explain how such routine services constitute direction of the enterprise. Merely "performing services for an enterprise, even with knowledge of the enterprise's illicit nature," does not normally expose an individual to RICO liability under § 1962(c). *Goren*, 156 F.3d at 728. Like the plaintiffs in *Goren*, Plaintiffs here allege facts showing a "business relationship" between Francione and DPD but fail to show that Francione "took some part in directing" the enterprise's affairs. *Id.* The current allegations thus fail to establish Francione's liability under § 1962(c). *See id.*; *see also Dahlgren v. First Nat'l Bank of Holdredge*, 533 F.3d 681, 690 (8th Cir. 2008) ("Bankers do not become racketeers by acting like bankers.") (internal quotation marks omitted).

Plaintiffs offer even fewer allegations as to the Bank's alleged participation in the enterprise. Beyond the allegations as to Francione, discussed above, the sole additional allegations relating to the Bank consist of claims that the Bank should have scrutinized Plaintiffs' account transactions because the recurring overdraft fees signaled some impropriety. *See* [1] ¶¶ 56–62, 67. Plaintiffs also claim that federal regulations require follow-up under such circumstances, though they do not identify the source or specific text of these alleged regulations. *See id*. ¶¶ 63–67. These allegations describe negligence at best. They do not show that the Bank "took some part in directing" DPD's affairs. *Goren*, 156 F.3d at 728. Nor do they support imposing vicarious liability because they do not show consent, knowledge, or "active" participation in the scheme on the part of the Bank. *See Michalowski v. Rutherford*, 82 F. Supp. 3d 775, 786 (N.D. Ill. 2015) (collecting cases). Thus, Plaintiffs do not plead sufficient facts to expose Francione or the Bank to RICO liability under § 1962(c). *See Iqbal*, 556 U.S. at 678; *Goren*, 156 F.3d at 728.

For the reasons discussed above, this Court dismisses Count I of Plaintiffs' complaint, alleging violations of § 1962(c), without prejudice.

### 4. RICO Conspiracy

Where, as here, a plaintiff's RICO conspiracy claim rests upon the same facts as the substantive RICO claim, *see* [1] ¶¶ 97–98, the plaintiff's failure to establish a RICO pattern under § 1962(c) requires dismissal of the § 1962(d) claim as well. *See, e.g.*, *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000);

*Menzies*, 197 F. Supp. 3d at 1103–04.  Accordingly, this Court dismisses Count II of Plaintiffs' complaint, alleging violations of § 1962(d), without prejudice.

### B.    State-Law Claims

Generally, when a district court dismisses all of a plaintiff's federal-law claims, any pendent state-law claims "should be left to the state courts." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994); 28 U.S.C. § 1367(c). In light of this Court's dismissal of Plaintiffs' RICO claims, this Court defers any ruling on Plaintiffs' state-law claims until—and if—Plaintiffs amend their complaint to present viable RICO claims.  *See Menzies*, 197 F. Supp. 3d at 1118.  If Plaintiffs cannot plead viable RICO claims, this Court may decline to exercise supplemental jurisdiction over their state-law claims.  *See Wright*, 29 F.3d at 1252; *Menzies*, 197 F. Supp. 3d at 1118.

Although Defendants assert various theories and rationales why this Court should proceed to dismiss Plaintiffs' state-law claims with prejudice, those contentions require resolving questions of state law whose resolution is not so clear that this Court may preemptively dispose of them.  *See Wright*, 29 F.3d at 1252. Accordingly, this Court declines to address such issues until it resolves its jurisdiction over such claims based upon any amended complaint.

### C.    Leave to Replead

Federal Rule of Civil Procedure 15(a)(2) instructs district courts to freely give leave to amend "when justice so requires."  This is the first time this Court has addressed Plaintiffs' claims, and Plaintiffs should have an opportunity to correct the

deficiencies outlined here. If any amended pleading suffers similar defects, however, this Court may deny a future motion to amend the complaint. *See Stanard v. Nygren*, 658 F.3d 792, 800 (7th Cir. 2011). At this stage, however, Plaintiffs may replead their claims if they can do so consistent with their obligations under Rule 11.

## IV. Conclusion

For the reasons explained above, this Court grants Defendants' motions to dismiss [24, 28, 31, 40]. This Court dismisses Plaintiffs' complaint without prejudice. Any amended complaint shall be filed on or before 11/1/2018.

Dated: September 10, 2018

Entered:

John Robert Blakey
United States District Judge