**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GLEN FLORA DENTAL CENTER, LTD., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 17-cv-9161 |
| v. | ) ) | Hon. Steven C. Seeger |
| FIRST EAGLE BANK, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

It's hard to say what type of job a person could get after leaving federal prison for a financial crime. Inmates don't exactly come out of prison with a world of employment opportunities at their fingertips. A felony conviction for a financial crime wouldn't be a resume builder. If you had to make a list of likely landing spots, a job that involves a position of trust managing other people's money probably wouldn't be at the top of the list.

Lenny Vihnanek and Larry Kelliher met in federal prison while serving sentences for bank fraud. Vihnanek and Kelliher left prison and, of all things, got jobs managing other people's money.

The two felons landed jobs with Dental Practice Development, a company that manages the business of five dental practices. The company hired the felons to oversee the financial operations of the businesses, including their bank accounts. Dental Practice Development handed the felons the keys to the kingdom, and put them in charge of minding the store.

The decision to hire two convicted felons was no accident. Dental Practice Development knew full well about their felony backgrounds. The company knew that they had met in prison, and knew that the convictions involved financial crimes.

Given that reality, you might think that the owners of the company would keep a close watch over the two convicted felons who were controlling the company coffers. Far from it. Dr. William Li, the majority owner of Dental Practice Development, turned a blind eye to the company's finances. The oversight was eyes wide shut.

If he had looked, Dr. Li could have seen the warning signs. Dr. Li had ready access to the company's financial records. He had the ability to check the books and discover the financial fraud for himself. But Dr. Li never looked. Dr. Li never looked at any bank statements from First Eagle Bank or any other financial records from 2010 to 2016. He didn't look under the financial hood, until things blew up.

Things ended badly. Vihnanek and Kelliher took the company for a ride. They embezzled company funds for personal gain, and the scheme lasted more than six years. Money flowed out of the dental practices and into the pockets of the two felons.

Dr. Li now blames . . . *the bank*. He believes that First Eagle Bank and one of its employees conspired with the two felons to rip off the dental companies.

Dental Practice Development and the other dental companies filed a complaint against First Eagle Bank and a former employee. They brought claims under the RICO Act and under the Illinois Fiduciary Obligations Act. The dental companies sued Vihnanek and Kelliher, too.

Discovery came and went, and the parties filed cross motions for summary judgment.

For the following reasons, Plaintiffs' motion for summary judgment is denied, and Defendants' motion for summary judgment is granted in large part and denied in small part.

## Background

At bottom, this case is about employee embezzlement, and the financial debris that followed. The parties agree that the two employees embezzled company funds. The question is whether the employees teamed up with the Bank when looting the company.

### *The Parties*

Dental Practice Development is a management services company that handles work for five interconnected dental practices: (1) Glen Flora Dental Center; (2) River West Smile Center; (3) Oral Kare Network II Ltd.; (4) All Family Dental Ltd.; and (5) Beverly Shores Smile Center Ltd. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 318). All six companies are Plaintiffs – for the sake of simplicity, the Court will refer to them collectively as the "Dental Practices."

Dr. William Li was the majority owner of Dental Practice Development and each of the five dental practices. *Id.* at ¶ 7. He had the ultimate responsibility for the operation of all of the companies. *Id.* at ¶ 9. As you might guess, Dr. Li is a dentist. *See* Li Dep., at 32:4 (Dckt. No. 282-10).

Lenny Vihnanek and Larry Kelliher are former employees of Dental Practice Development. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 3, 4 (Dckt. No. 318). Vihnanek worked for the company from 1992 to 2012, and Kelliher worked there from 1996 to 2016. *Id.* Vihnanek was the president of Dental Practice Development. *Id.* at ¶ 12.

They were part owners, too. Vihnanek and Kelliher were minority owners of Dental Practice Development, and All Family Dental. *Id.* at ¶¶ 12, 14–15.

3

Dr. Li was supposed to supervise Vihnanek and Kelliher. *Id.* at ¶ 10. After all, the companies were *his* companies. But in reality, Dr. Li did not supervise them at all. *Id.* That hands-off approach led to a chain of events that ended in financial catastrophe.

### The Felony Convictions

Vihnanek and Kelliher had a spotty record, to put it mildly. They were not novices when it came to financial fraud. *Id.* at ¶¶ 17–18. They met in prison while serving time for felony convictions for bank fraud. *See* Li Dep., at 40:13-25, 41:19, 42:11-19 (Dckt. No. 282-10); *see also* Superseding Information, *United States v. Kelliher*, 91-cr-649 (N.D. Ill.) (Dckt. No. 282-12); Information, *United States v. Vihnanek*, 92-cr-841 (N.D. Ill.) (Dckt. No. 282-13).

Their rap sheets were no secret. Dr. Li knew about Vihnanek and Kelliher's checkered past by the mid-1990s. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 17–18 (Dckt. No. 318).

Dr. Li hired Vihnanek in 1992, and not much later, Dr. Li learned that Vihnanek had been charged with a federal crime. *See* Li Dep., at 33:14-21 (Dckt. No. 282-10). But Dr. Li stood by him. In fact, Dr. Li was a character witness for Vihnanek at his sentencing hearing in federal court in February 1993. *Id.* at 34:1 – 35:23. The company even gave Vihnanek's family a monthly stipend while he was incarcerated. *Id.* at 38:2-15.

Dr. Li knew the nature of the crime, at least in broad strokes. He knew that it was a financial crime. He knew that the crime involved "bank kiting." *Id.* at 35:17 – 36:24.

Vihnanek received a year and a day from Judge Grady in the Northern District of Illinois. *See* 2/4/93 Order in *United States v. Vihnanek*, 92-cr-841 (N.D. Ill.). Dr. Li gave Vihnanek his job back after Vihnanek served time in federal prison. *See* Li Dep., at 37:10-14 (Dckt. No. 282-10).

When Vihnanek rejoined the company, he went to bat for Kelliher, his friend from prison. Dr. Li testified that Vihnanek (a convicted felon) recommended the hiring of Kelliher (another convicted felon). They were prison pals:

> Q:    All right. Who recommended Mr. Kelliher to DPD [Dental Practice Development]?
>
> A:    Mr. Vihnanek.
>
> 　　　　　　　*　　　*　　　*
>
> Q:    Did you ever interview him?
>
> A:    I did not interview him.
>
> Q:    What did you know about Mr. Kelliher before he was hired?
>
> A:    Mr. Vihnanek mention[ed] that Larry Kelliher went away for a family member. In other words, he went to the pen for a family member.
>
> Q:    For doing what?
>
> A:    He never – nothing was ever said about for what. Something with a bank. Something associated with a bank.
>
> Q:    Did Mr. Vihnanek happen to mention that Mr. Kelliher, like Mr. Vihnanek himself, had been convicted of bank fraud?
>
> A:    Mr. Vihnanek did not. But Mr. Vihnanek did say that he met Mr. Kelliher at the prison.

*Id.* at 39:23 – 40:1, 40:6 – 41:1.

So the company hired a convicted felon, based on the recommendation of a convicted felon. But Dr. Li did not think that it was "crazy" to hire a convicted felon based on a recommendation by another convicted felon, because someone else (Mr. Tokunaga) had recommended him too:

> Q:    So, in other words, you went along with hiring a convicted felon, Mr. Kelliher, on the recommendation of another convicted felon who had met him in prison, Mr. Vihnanek; is that correct?

[Objection omitted]

A:     No.

[Attorney statement omitted]

A:     The answer to that is no.  I was counting on Mr. Tokunaga's position.  If it was okay with him, it was okay with me.

Q:     Okay.  So it was okay with him and therefore you were okay with hiring somebody convicted of a felony involving a bank who – on the recommendation of another person who was convicted of a felony in connection with a bank who met him in prison; is that correct?

[Objection omitted]

A:     Yes.

Q:     Does this sound kind of crazy to you?

A:     No, it isn't.

*Id.* at 41:20 – 42:22.

As it turns out, Mr. Tokunaga was familiar with the criminal justice system, too.  In 1993, Tokunaga was charged in federal court with conspiring in violation of 18 U.S.C. § 1954, which prohibits kickbacks to influence operations of ERISA benefit plans.  *See* Superseding Indictment, *United States v. Li et al.*, 93-cr-897 (N.D. Ill.) (Dckt. No. 282-11).  He was acquitted at trial.

Of all things, Dr. Li apparently knew all about prison, too.  He had an insider's perspective.  In 1993, Dr. Li was charged with conspiring and paying kickbacks in violation of 18 U.S.C. § 1954 and money-laundering in a four-count federal indictment, in the same case as Tokunaga.  *See* Superseding Indictment, *United States v. Li et al.*, 93-cr-897 (N.D. Ill.) (Dckt. No. 282-11); *see also* Li Dep., at 69:4 – 70:3 (Dckt. No. 282-10).  A jury found Dr. Li guilty of two counts.  Judge Hart sentenced him to three months for each count, running concurrently.

6

So, all of the players in the story have a history of getting charged in federal court for financial misconduct. A convicted felon (Dr. Li) agreed to the hiring of a convicted felon (Kelliher) based on the recommendation of another convicted felon (Vihnanek) and someone who was charged and acquitted of a felony (Tokunaga).

In a nutshell, Dental Practice Development handed the keys to the kingdom to two convicted felons. Vihnanek and Kelliher ran the show when it came to the company's finances:

Q:   Okay. So DPD had these two convicted felons running the DPD business; correct?

A:   Yes.

Q:   And Mr. Vihnanek and Mr. Kelliher handled the bookkeeping; correct?

A:   Yes, they did.

Q:   And they were the ones who were delegated the responsibility of opening bank accounts; correct?

A:   They did all the – yes. They did all the legwork, yes.

Q:   Okay. And they were given that responsibility by DPD; correct?

A:   Yes.

                        *        *        *

Q:   And you gave Mr. Vihnanek and Mr. Kelliher the power to sign checks, did you not?

A:   Yes, I did.

Q:   And you gave them the power to pay bills; correct?

A:   Yes, I did?

                        *        *        *

Q:   Okay. That wasn't my question. My question was whatever bank you were using, you gave Mr. Vihnanek and Mr. Kelliher the power to deal with the bank on behalf of DPD and the dental practices; correct?

> A:   Yes.

*See* Li Dep., at 49:7 – 50:17 (Dckt. No. 282-10).

Basically, Dr. Li put Vihnanek and Kelliher in charge of managing the Dental Practices' finances, despite their criminal records. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 24 (Dckt. No. 308); Pls.' Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 318). Dr. Li entrusted all financial and management functions to the two felons, based on the recommendation of Mr. Tokunaga. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 318).

### *The Bank*

In 2006, Dental Practice Development opened bank accounts for itself and the five other dental companies at First Eagle Bank. *See id.* at ¶ 23. Vihnanek recommended that particular bank. *See* Li Dep., at 50:10-11 (Dckt. No. 282-10). Vihnanek's sister-in-law, Mikki Francione, was then an assistant vice president at First Eagle. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 7 (Dckt. No. 308). She is one of the two Bank Defendants.

Dr. Li gave Vihnanek and Kelliher the green light to open the First Eagle accounts and execute any required documents. *See* Li Dep., at 49:10-24 (Dckt. No. 282-10); Pls.' Resp. to Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 318). Dr. Li also allowed Vihnanek and Kelliher to sign checks, pay bills, and deal with First Eagle employees. *See* Li Dep., at 50:1-16 (Dckt. No. 282-10).

Dr. Li never told the bank that his two fiduciaries were convicted felons. In fact, he thought that the *bank* should have asked *him*:

> Q:   Did you ever tell anybody from First Eagle Bank "I just want you to know that Lenny Vihnanek was convicted of bank fraud"?

8

A: No, I did not.

Q: Did you ever tell anybody at First Eagle Bank "Hey, I want you to know that my fiduciary, Larry Kelliher, has been convicted of bank fraud"?

A: No, I did not.

Q: Don't you think that's something the bank should have known?

[Objection omitted]

A: The bank . . .

[Objection omitted]

Q: Don't you think you should have let the bank know that your fiduciaries were convicted bank felons?

[Objection omitted]

A: I have no idea that that was ever a requirement, sir. The bank, if they thought about that, *they should have asked me*. They should have called me.

*Id.* at 51:24 – 53:3 (emphasis added).

### *The Embezzlement*

Things went fine for a while. But before long, things went south. Vihnanek and Kelliher apparently diverted company funds from First Eagle Bank for their own personal use. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 24–25 (Dckt. No. 308). By January 2010, they apparently began embezzling funds from the dental practice accounts. *See* Pls.' Statement of Facts, at ¶ 25 (Dckt. No. 294)*.*

Dr. Li acknowledged that he was supposed to be supervising Vihnanek and Kelliher when it came to the bank accounts. *See* Li Dep., at 64:19 – 65:9 (Dckt. No. 282-10). But Dr. Li didn't do anything to supervise them:

> Q:      And would you agree with me that you did not set up any supervisory measures regarding either Kelliher or Vihnanek's access to bank accounts?
>
> A:      No.  I trusted the two guys.  No, I did not.  I trusted them.

*Id.* at 65:10-15.

Warning signs of possible financial shenanigans began early into the alleged scheme.  In August 2010, eight months after the embezzlement allegedly started, Dr. Li threatened to disband Dental Practice Development for "mismanagement."  *See* 8/26/10 Li Email (Dckt. No. 275-30). Dr. Li said that he would look at the company's financials, but he never did.  *Id.*

Dental Practice Development started racking up significant fees with First Eagle Bank for insufficient funds.  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 54, 56 (Dckt. No. 308).  If he had checked, Dr. Li would have seen "a lot" of bank fees for insufficient funds in 2010.  *See* Li Dep., at 100:21-23 (Dckt. No. 282-10).

Dr. Li had the company's financial records at his fingertips.  Throughout the fraud, Dr. Li had access to monthly bank statements, canceled checks, and other records.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 43–45 (Dckt. No. 318).  He did not receive hard copies, but he could have obtained them from the Bank.  *Id.* at ¶ 45.

But Dr. Li never made any effort to look at the bank statements.  He never asked to see the bank statements until *June 2016*, six years after the embezzlement began:

> Q:      Did you know that banks send out monthly account statements to their customers?
>
> A:      Yes, I'm aware of it.
>
> Q:      Did you ever ask to see any monthly account statements?
>
> A:      No, I have not.
>
> Q:      Did you ever see any monthly account statements from First Eagle Bank?

A:     I did not.

Q:     Did you ever make any effort to see them?

A:     No, I did not.

Q:     Did you ever ask the bank to see them?

A:     I asked the bank in the middle of June of 2016 of all six accounts, all the bank accounts to the practice and to DPD, because I want to do a cursory assessment.

Q:     Prior to that had you ever asked the bank to see any of the account statements for DPD or the practices?

A:     No, I did not.

*See* Li Dep., at 66:6 – 67:2 (Dckt. No. 282-10).  Dr. Li never asked Vihnanek or Kelliher to show him the bank statements, either.  *Id.* at 67:3-11.

Dr. Li could have looked at QuickBooks ledgers with the accounting information, too. *Id.* at 178:17-23.  But Dr. Li never opened QuickBooks' software until October 2015.  *Id.* at 191:1 – 196:14.  A few months earlier, in summer 2015, Kelliher's assistant had contacted Li's wife to suggest that Dr. Li investigate Kelliher's financial conduct.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 71 (Dckt. No. 318).

First Eagle Bank executives received daily reports about overdraft fees on Plaintiffs' accounts.  *See* Kaveney Dep., at 201:12-24, 202:6-24 (Dckt. No. 294-18).  Employees of the bank asked Kelliher about the overdrafts.  He said they were caused by cash flow problems, and the bank employees say that they took Kelliher at his word.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 57–58 (Dckt. No. 318); Kelliher Dep., at 492:4-24 (Dckt. No. 275-9).  Francione (again, the bank employee) also cautioned Kelliher to be more careful when making deposits. *See* Francione Dep., at 215:14-21 (Dckt. No. 309-4).

11

Still, First Eagle employees testified that they thought that Kelliher was a lousy businessman, not a con-man. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 58 (Dckt. No. 318); Francione Dep., at 173:23-24 (Dckt. No. 309-4).

Other voices raised financial issues, too. At various times, employees and suppliers complained that they went unpaid, but Dr. Li did not investigate. *See* Pls.' Resp. to Interrogs., at ¶ 12 (Dckt. No. 275-3); Li Dep., at 102:3 – 104:16 (Dckt. No. 282-10). Dr. Li asked Kelliher about the non-payments. Kelliher said it "would all be taken care of," and Dr. Li took him at his word. *See* Li Dep., at 104:10-24 (Dckt. No. 282-10).

Dr. Li finally looked at the company's monthly bank statements in June 2016. *Id.* at 66:6 – 67:17. He spotted a large number of overdrafts and overdraft fees. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 77 (Dckt. No. 318). He had noticed "suspicious" activity almost immediately when he looked at the QuickBooks months earlier, in October 2015. *See* Li Dep., at 191:1 – 196:14 (Dckt. No. 282-10).

Dr. Li fired Kelliher because of the overdrafts and fees in June 2016. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 78 (Dckt. No. 318).

The embezzlement led to substantial losses for the Dental Practices. The parties dispute the total amount of the loss. Plaintiffs estimated that they lost more than $2 million. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 25 (Dckt. No. 308).

### *The Lawsuit*

In 2017, the Dental Practices sued Vihnanek, Kelliher, First Eagle Bank, and Mikki Francione. Francione is a former employee of the Bank – and as a reminder, she is Vihnanek's sister-in-law. *Id.* at ¶¶ 3–5, 7. The complaint advanced five claims, including two counts under RICO, breach of fiduciary duty, conversion, and negligence.

The Dental Practices later filed an amended complaint, which contained eight counts. *See* Am. Cplt. (Dckt. No. 77). The first five claims are RICO claims. Counts I and II are RICO claims against Vihnanek and Kelliher. Count III is a RICO claim against Francione, and Counts IV and V are RICO claims against First Eagle Bank (for direct and vicarious liability).

The last three claims arise under Illinois law. Count VI is a breach of fiduciary duty claim against Vihnanek, Kelliher, and Francione. Count VII is a conversion claim against Vihnanek and Kelliher. And Count VIII is a claim against First Eagle Bank and Francione under the Illinois Fiduciary Obligations Act ("IFOA"), 760 ILCS 65/1, *et seq.*

Judge Blakey (this Court's predecessor, before reassignment) narrowed the suit. *See* 9/23/19 Mem. Opin. & Order (Dckt. No. 116). After the trimming, three claims remain against First Eagle Bank and Francione. *See* Pls.' Mtn. for Summ. J., at 2 (Dckt. No. 279); Defs.' Mtn. for Summ. J., at 1 (Dckt. No. 273).

Specifically, First Eagle Bank and Francione are facing two claims under RICO, and one claim under state law. Count III alleges that Francione (again, the bank employee) engaged in a racketeering conspiracy under RICO, 18 U.S.C. § 1962(d). Count IV levies the same allegation against First Eagle Bank. *See* Am. Cplt., at 57–60 (Dckt. No. 77). Count VIII alleges that the Bank and Francione violated the Illinois Fiduciary Obligations Act.

Plaintiffs later moved to strike a bunch of the affirmative defenses. Judge Blakey denied the motion to strike the statute of limitations defense for the remaining claims. *See* 9/17/20 Mem. Opin. & Order, at 7, 11 (Dckt. No. 247).

Discovery is over. Plaintiffs and the two Bank Defendants (First Eagle Bank, and Francione) filed cross motions for summary judgment on all remaining claims. *See* Pls.' Mtn. for Summ. J. (Dckt. No. 279); Defs.' Mtn. for Summ. J. (Dckt. No. 273).

Vihnanek settled. *See* 6/03/21 Minute Entry (Dckt. No. 312). Kelliher is *pro se*, and did not move for summary judgment. *See* Parties' Joint Statement, at 2 (Dckt. No. 357).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

When, as here, parties file cross motions for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-movant for each separate motion. *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361

(7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

In other words, this Court will construe the facts in a light favorable to Plaintiffs when considering Defendants' motion for summary judgment. And on the flipside, this Court will construe the facts in a light favorable to Defendants when considering Plaintiffs' motion for summary judgment. The team playing defense gets the benefit of any close calls and jump balls.

**Analysis**

**I. RICO Act (Counts III & IV)**

The Court will start with the two RICO claims. Counts III and IV allege that First Eagle Bank and Francione joined a racketeering conspiracy in violation of 18 U.S.C. § 1962(d). *See* Am. Cplt., at 57–60 (Dckt. No. 77).

"Congress passed RICO in an effort to combat organized, long-term criminal activity." *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). Section 1962(d) makes it unlawful to conspire to violate any of the substantive provisions of the statute – *i.e.*, subsections (a), (b), or (c). *See* 18 U.S.C. § 1962(d). "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998).

"In order to state a claim for § 1962(d) conspiracy, 'a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further

15

agreed that someone would commit at least two predicate acts to accomplish those goals.'" *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001)). A plaintiff also must show that the defendant knew about the conspiracy. *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017).

The parties filed cross motions for summary judgment, and the burdens are mirror images of each other. To obtain summary judgment, Plaintiffs have the burden to prove that there is no genuine issue on any of the elements, and that the undisputed facts establish liability as a matter of law. Plaintiffs have to run the table. To defeat that motion, the Bank Defendants simply must show that there is a genuine issue of material fact on at least one of the elements. As the non-movants, the Bank Defendants simply have to poke a hole.

On the flipside, to prevail on their motion for summary judgment, the Bank Defendants must demonstrate that the record does not support one of the elements of Plaintiffs' claim. That is, the Bank Defendants must show that Plaintiffs have not checked one of the boxes. To defeat that motion, Plaintiffs must come forward with evidence on each of the elements. That is, Plaintiffs must show that they have the goods on each part of the claim, meaning that they have enough evidence to support a finding in their favor by a reasonable jury.

The parties addressed each of the elements of a RICO claim, plus the affirmative defense of the statute of limitations. The first argument is about knowledge of a conspiracy. The second argument is about the existence of an agreement to participate in a conspiracy. The third argument is about the existence of an agreement to commit two predicate acts. The fourth and final argument is about the statute of limitations.

A.      Knowledge

The first issue is knowledge of the alleged conspiracy.  As a threshold matter, a RICO claim requires evidence that the defendant knew about the conspiracy.  *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017).  No knowledge, no claim.

A plaintiff can establish knowledge through evidence of actual knowledge or willful blindness.  *Id.*  Here, Plaintiffs do not argue that First Eagle had actual knowledge of a conspiracy.  Instead, Plaintiffs claim that the bank was willfully blind.  *See* Pls.' Mem. in Support of Summ. J., at 8 (Dckt. No. 285) ("Plaintiffs do not allege that FEB had actual knowledge, but rather that it had willful blindness.").

"An inference of knowledge through willful blindness requires that the defendant 'believe that there is a high probability that a fact exists' and 'take deliberate actions to avoid learning of that fact.'"  *Domanus*, 847 F.3d at 480 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).  "Only a subjective belief that there is a high probability that the fact is true, coupled with deliberate steps to avoid learning the fact, is equivalent to knowledge." *Id.* at 481.

"[F]inding the line between 'willful blindness' and 'reason to know' may be like finding the horizon over Lake Michigan in a snowstorm. . . . In other words, only rarely could that line be drawn as a matter of law."  *See Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 685 (7th Cir. 2014).

The dividing line between "willful blindness" and "reason to know" might look sketchy, especially on the margins.  Wherever the dividing line is, there is evidence on both sides of the line in the case at hand.  The record includes enough evidence to create a genuine issue of material fact about whether the Bank Defendants acted with willful blindness.

For starters, consider the evidence about the subjective beliefs of the Bank Defendants.

Some evidence suggests that the Bank Defendants subjectively believed that Kelliher's conduct was improper. For example, a bank employee (Christine Freund) sent First Eagle CEO Andy Salk an email saying that the accounts had "chargebacks (kiting) in the past, but this should be almost eliminated now."[1] *See* Ex. 34 (Dckt. No. 294-34); *see also* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 72 (Dckt. No. 308). On a different occasion, another First Eagle employee emailed Francione that Kelliher's conduct was "questionable," and that he was "full of tricks." *See* Ex. 36 (Dckt. No. 294-36); Defs.' Resp. to Pls.' Statement of Facts, at ¶ 76 (Dckt. No. 308).

The Bank Defendants respond that they simply thought that Kelliher was a lousy businessman. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 58 (Dckt. No. 308); Francione Dep., at 173:23-24 (Dckt. No. 309-4) ("I thought he [Kelliher] was a very poor business manager."); Freund Dep., at 173:16-17 (Dckt. No. 309-10) ("I always thought that [Kelliher] was very poor at managing the accounts[.]"). According to the Bank Defendants, they believed that Kelliher was a subpar money manager – not an embezzler. And if that's the case, they are not liable under the RICO Act.

The second question is whether the Bank Defendants took deliberate steps to avoid learning about the embezzlement.

In ruling on the motion to dismiss, Judge Blakey explained that the Dental Practices "adequately allege[d] willful blindness because they claim[ed] that First Eagle executives received *weekly* reports regarding overdraft charges, but despite seeing the 'red flags' for

---

[1] At deposition, Freund denied that she ever believed Kelliher was kiting checks. *See* Freund Dep., at 189:10-23 ("Sounds like we had issues with chargebacks, which I have kiting in parentheses because it could be an indication of kiting."). In fact, the Bank Defendants deny that check kiting happened at all. *See* Defs.' Resp. to Pls.' Mem. for Summ. J., at 9 (Dckt. No. 307).

criminal activity, they allowed the illegal scheme to continue." *See* 9/23/19 Mem. Opin. & Order, at 15–16 (Dckt. No. 116) (emphasis added).

In fact, discovery uncovered evidence that weighed even more heavily in favor of willful blindness. As it turns out, First Eagle executives received *daily* – not weekly – reports about those overdraft reports. *See* Kaveney Dep., at 201:12-24, 202:6-24 (Dckt. No. 294-18).

And the nonsufficient fund fees were significant. The dental practice accounts accumulated a whopping $339,000 in fees between January 2010 and June 2016. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 54 (Dckt. No. 308).

At the peak of the scheme in 2015, Plaintiffs' accounts represented 23.84% of the Bank's nonsufficient fund fee income. *Id.* at ¶ 60. The bank's own expert admitted how unusual it was to have such a high percentage of fees from one customer. The bank's expert admitted that, in his 50-year banking career, he had never seen a single customer account with such a large percentage of a bank's fees. He testified that he had "never seen a depositor have as many overdrafts as this particular depositor or plaintiffs had." *See* Zacharias Dep., at 279:3-13 (Dckt. No. 294-19).

A reasonable jury could find that the Bank Defendants deliberately avoided learning more about the Dental Practices' accounts to avoid losing out on overdraft fees.

But the Bank Defendants have evidence on their side of the ledger, too. Basically, they contend that they took steps that would have uncovered criminality – but those steps did not take them far.

For example, the Bank Defendants dealt with Kelliher on overdrafts on a near-daily basis between 2010 and June 2016. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 36–37 (Dckt.

19

No. 318). Kelliher told Francione (or another bank employee) which checks to pay, and which checks to reject, if the accounts had insufficient funds. *Id.* at ¶ 37.

The Bank Defendants contend that they asked Kelliher about the overdrafts. Kelliher responded that they were caused by cash flow problems, and they took him at his word. *Id.* at ¶¶ 57–58; Kelliher Dep., at 492:4-24 (Dckt. No. 275-9) ("[If asked about why the accounts were so frequently overdrawn] I would have said – I believe – it was cash flow. It was the fact that we hadn't been paid by this contract or that contract . . . ."); Francione Dep., at 318:3-21 (Dckt. No. 275-13) ("When the overdrafts started on a more regular basis . . . they probably told me that that is why it was happening, because they had to make up for this money that was no longer coming in."). And if there was an issue with a deposited check (*e.g.*, if Kelliher deposited the same check twice), the Bank Defendants spoke with Kelliher, warning him to exercise more care when making deposits. *See* Francione Dep., at 215:14-21 (Dckt. No. 309-4).

A reasonable jury could find the Bank Defendants' evidence credible. A reasonable jury could conclude that the Bank Defendants did not take deliberate steps to avoid learning more about the alleged fraud.

In the end, there is evidence on both sides of the ledger. There is enough evidence to support a finding of willful blindness. And there is enough evidence to reach the opposite conclusion.

Because a reasonable jury could come out either way, Plaintiffs' motion for summary judgment is denied. The evidence is not so lopsided in Plaintiffs' favor to entitle them to summary judgment. Defendants, too, cannot obtain summary judgment based on this element, because Plaintiffs offered enough evidence to live to fight another day.

To obtain summary judgment, Defendants will need to point to another element that lacks sufficient evidence. As it turns out, Defendants did just that.

## B. Agreement

The next question is whether the record could support a finding by a reasonable jury that the Bank Defendants agreed to participate in racketeering activity.

A RICO conspiracy requires two agreements. *See Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001). A plaintiff must show both that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Id.*

The Court will address each requirement in turn.

### 1. Agreement to Participate

The first question is whether the record could support a finding by a reasonable jury that the Bank Defendants agreed to participate in a conspiracy. After reviewing the record as a whole, and viewing it in a light favorable to Plaintiffs (as the non-movants), the Court concludes that the evidence could not support that finding by a reasonable jury.

"An agreement to participate in the affairs of an enterprise is an agreement to knowingly facilitate the activities of those who are operating the enterprise in an illegal manner." *James Streibich Revocable Tr. of 2002 v. Flagstad*, 2020 WL 6134980, at *6 (N.D. Ill. 2020) (citing *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 869 (7th Cir. 2001)). The RICO Act defines an enterprise as "any individual, partnership, corporation, association, or other legal

21

entity, and any union or group of individuals associated in fact although not a legal entity." *See* 18 U.S.C. § 1961.[2]

"Formal agreement is not necessary; when the acts performed by the alleged members of the conspiracy are unlikely to have been done alone, the court may infer agreement." *Domanus*, 847 F.3d at 481–82. However, "mere association with conspirators is not enough to establish an agreement." *Id.* at 482.

The evidence "must tend to exclude the possibility that the alleged conspirators acted independently." *Id.* (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 767 (1984)). And "[b]ankers do not become racketeers by acting like bankers." *Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank*, 934 F.2d 976, 981 (8th Cir. 1991).

The Dental Practices point to a dozen "red flags" to show that the Bank Defendants agreed to participate in an embezzlement scheme. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 22–35 (Dckt. No. 326). For ease of analysis, the Court groups those red flags as follows: (1) earning high overdraft fees; (2) failing to double-check the Dental Practices' corporate resolutions and Li's updated signature cards; (3) knowing about Kelliher's questionable conduct (including double-depositing checks, overstating the amount of deposits, and submitting checks with missing signatures or addresses); and (4) mentioning the high nonsufficient fund fees in Francione's performance review. *Id.*

---

[2] Plaintiffs' motion for summary judgment does not discuss whether the "enterprise" requirement is met. *See* Pls.' Mem. in Support of Summ. J., at 8 (Dckt. No. 285). The Bank Defendants raise this point in their response to the motion. *See* Defs.' Resp. to Pls.' Mem. for Summ. J., at 17–18 (Dckt. No. 307). Because a plaintiff bears the burden of proof, it must prove each element to obtain summary judgment. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). So, Plaintiffs' failure to prove an enterprise existed means the Court cannot grant their motion for summary judgment on the RICO claims. That failure of proof, standing alone, is reason enough to deny Plaintiffs' motion. Because the Bank Defendants also move for summary judgment, the Court will address the other elements in depth.

In Plaintiffs' view, the fact that "Kelliher was able to do all of this without anyone at FEB [First Eagle Bank] putting a stop to it or contacting [Li] all means that this was made possible and facilitated by FEB." *Id.* at 35. The Dental Practices claim that "the mere inaction of Bank Defendants despite all the 12 suspicious red flags amounts to an agreement." *Id.* at 36.

The Bank Defendants disagree. In their view, "Plaintiffs can offer nothing more than evidence that they think shows the Bank Defendants were negligent in failing to learn about the alleged embezzlement and should have done more than they did with the overdrafts. This does not and cannot supply any proof that the Bank Defendants knowingly agreed to participate in the embezzlement scheme and agreed to the commission of two predicate acts." *See* Defs.' Mem. in Support of Summ. J., at 27 (Dckt. No. 274).

The Court will evaluate the evidence offered by the Dental Practices in the following order: (1) the overdraft and nonsufficient fund fees; (2) the failure to double-check certain documents; (3) the knowledge of Kelliher's questionable conduct; and (4) Francione's performance review. The punchline is simple: there is insufficient evidence to support a finding by a reasonable jury that the Bank Defendants agreed to a conspiracy.

***Overdraft and Nonsufficient Fund Fees.*** The Court starts with the overdraft and nonsufficient fund fees. At the motion to dismiss stage, Judge Blakey inferred that First Eagle agreed to participate because of allegations that "First Eagle facilitated [and] benefitted from the alleged scheme because it received 'significant income' from fees that it received from overdraft activities on Plaintiffs' accounts." *See* 9/23/19 Mem. Opin. & Order, at 15 (Dckt. No. 116).

Overdraft fees and nonsufficient fund fees are birds of a feather. A client incurs overdraft fees when he issues a check exceeding the amount of deposits, and the check is paid out. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 318). When the check is returned

*unpaid*, the client incurs nonsufficient fund fees, instead. *Id.* at ¶ 33. These fees are common practice for banks, because resolving overdrafts costs time and money. *Id.* at ¶ 34. Indeed, dozens of First Eagle customers were routinely overdrawn. *Id.* at ¶ 38.

The Dental Practices' accounts accumulated roughly $339,000 in overdraft fees between January 2010 and June 2016 – which comes out to about $1,000 a week over a 6.5-year span. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 54 (Dckt. No. 308); *see also* Ex. 1 (Dckt. No. 77-1).

In 2015, nonsufficient fund fees on the Dental Practices' accounts made up about a quarter (23.84%) of *all* such fees obtained by First Eagle. *See* Kaveney Dep., at 329:1-3 (Dckt. No. 294-18); *see also* Zacharias Dep., at 278:8 – 279:6 (Dckt. No. 294-19). After Dr. Li fired Kelliher in June 2016, First Eagle's total nonsufficient fund fees declined significantly, dropping by 23.78% in 2016 compared to the averages from 2010 to 2015. *See* Kaveney Dep., at 331:21 – 334:18 (Dckt. No. 294-18).

The Bank Defendants, however, dispute that the fees were significant. From 2010–2016, nonsufficient fund and overdraft fees represented just 1.8% of all bank income. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 50 (Dckt. No. 318). And fees from the Dental Practices' accounts represented less than a quarter of that 1.8%. *Id.* Viewed from that perspective, those fees aren't a big slice of the First Eagle revenue pie – they're mere crumbs.

Courts have rejected the idea that knowledge of bad banking practices – like check kiting or uncollected balances – is enough to show an agreement to facilitate a RICO enterprise. *See, e.g.*, *Frost Nat. Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 870–71 (7th Cir. 2001) (finding no evidence of an agreement where bank was suspicious of check kiting scheme but did not immediately take steps to stop it); *Rosemann v. St. Louis Bank*, 858 F.3d 488, 500–01 (8th Cir.

24

2017) (holding that evidence of a bank handling extensive overdrafts was not sufficient to show that it objectively manifested agreement to participate in a civil conspiracy); *Dahlgren v. First Nat. Bank of Holdrege*, 533 F.3d 681, 690 (8th Cir. 2008) (concluding that there was insufficient evidence to support a RICO claim where bank allowed commingling of funds and honored substantial overdrafts); *Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534, 539 (5th Cir. 2007) (concluding that a court could not reasonably infer that a bank employee agreed to assist in fraud from the fact that she ignored "warning signs" and performed ordinary banking functions); *Sundial Int'l Fund Ltd. v. Delta Consultants, Inc.*, 923 F. Supp. 38, 41 (S.D.N.Y. 1996) (dismissing RICO claims against bank officers and banks who held investors' deposits in fraud schemes where banks did not solicit investments or drive the operation).

At bottom, the Dental Practices argue that this Court should infer agreement from the fact that the Bank Defendants stood to gain, financially, from nonsufficient fund fees.

But financial benefit alone cannot show that the Bank Defendants agreed to join a *RICO conspiracy*. The Bank's actions "are easily explained by their own self-interest: making money and keeping a client happy . . . ." *Domanus*, 847 F.3d at 482 (upholding dismissal of RICO claim against lawyers who agreed to restructure bills and coordinate litigation activity).

To state the obvious, banks are for-profit institutions. They want to earn fees. Bankers are not in the business of turning down money. A bank collecting overdraft fees – no matter the size – is not itself a sign of a conspiracy. It's a sign of a bank acting like a bank.

No evidence in the record shows that the Bank Defendants attempted to cultivate overdraft fees from the Dental Practices. And certainly, nothing shows that the Bank Defendants wanted Kelliher to embezzle money.

Basically, the Bank Defendants collected the fees as they came – that's it. Any rational, money-making bank would have done the same. So, the overdraft and nonsufficient fund fees do not show agreement to conspire.

***Corporate Resolutions and Signature Cards.*** Next, the Court turns to the Bank Defendants' failure to double-check the corporate resolutions and the signature cards.

The Dental Practices had to submit corporate resolutions to First Eagle when opening new accounts. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 30–31 (Dckt. No. 308). The Bank Defendants also obtained copies of those resolutions from the state of Illinois. *Id.* at ¶ 35. Apparently, some of the corporate resolutions submitted to First Eagle mismatched what the state had on file. *Id.* at ¶¶ 36–40. Some resolutions sent to First Eagle listed Vihnanek and Kelliher as officers, when they were not. *Id.* at ¶ 38.

The mismatched corporate resolutions don't show evidence of an *agreement to conspire*, though. They do not "tend to exclude the possibility that the alleged conspirators acted independently." *See Domanus*, 847 F.3d at 482.

Vihnanek and Kelliher were officers of Dental Practice Development (the management company) and minority owners of one other plaintiff entity. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 12, 14–15 (Dckt. No. 318). But Dr. Li entrusted them with managing finances for all of the Dental Practices. *Id.* at ¶ 24. In other words, they were fiduciaries for the Dental Practices. They were authorized to write checks and pay bills for the Dental Practices. *See id.* at ¶ 21; *see also* Li Dep., at 61:8 – 62:22 (Dckt. 282-10).

If the bank had uncovered the mismatch between the resolutions it received (one the one hand), and the resolutions on file with the state of Illinois (on the other), it would not have

thwarted the alleged scheme. Vihnanek and Kelliher had permission to engage in transactions from those accounts.

If the resolutions on file with First Eagle showed permission, but the resolutions on file with the state did not, that *might* be circumstantial evidence of an agreement.

However, Vihnanek and Kelliher were authorized to write checks, whatever the resolutions said. So, Vihnanek and Kelliher could have accomplished the alleged fraud without any help from the Bank Defendants. Put differently, whether the Bank Defendants ignored any discrepancies with the corporate resolutions does not relate to whether Vihnanek and Kelliher acted alone. *See Domanus*, 847 F.3d at 481–82.

At most, failure to uncover the mismatch shows negligence by the Bank Defendants – and negligence does not make a conspiracy. A reasonable jury could not infer that the mismatched corporate resolutions showed an agreement to conspire.

In a similar vein, at some point, the Dental Practices updated Dr. Li's signature cards for certain accounts, and the signatures looked different. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 50 (Dckt. No. 308). The Bank Defendants did not verify Dr. Li's signature after the updates. *Id.* at ¶¶ 51–52.

Like the corporate resolution discrepancy, the signature card discrepancy does not show an agreement to conspire. Evidence of different signatures might help the Dental Practices' case if they argued that Vihnanek and Kelliher used a false signature. But the allegedly fraudulent checks did not bear Dr. Li's signature. Most of them were signed by Kelliher (who, again, had permission to manage the Dental Practices' finances). *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 73 (Dckt. No. 308).

27

Maybe it was negligent of the Bank Defendants not to notice the different handwriting on the two signatures. But negligence says nothing about whether the Bank Defendants agreed to conspire with Vihnanek and Kelliher.

The Bank Defendants' failure to sound the alarm on Dr. Li's different signature cards is consistent with Vihnanek and Kelliher acting alone. *See Domanus*, 847 F.3d at 481–82. So, the signature card discrepancy does not show that the Bank Defendants agreed to conspire.

**_Knowledge of Kelliher's Questionable Conduct._** The Court turns next to the Bank Defendants' knowledge of Kelliher's allegedly questionable conduct.

Basically, the Dental Practices point out that the checks had irregularities (like the wrong names of account owners and mismatched addresses). First Eagle knew that Kelliher overstated the amounts of his deposits, and First Eagle employees sent some emails about Kelliher's "questionable" conduct. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 31–35 (Dckt. No. 326).

As the Court sees it, these arguments go more toward *willful blindness* than *agreement*. Knowledge of questionable conduct could suggest a subjective belief that something was fishy. But knowledge that a person did something questionable is not evidence of agreement to *join a conspiracy* with that person. *See, e.g.*, *Frost*, 241 F.3d at 870 (concluding that knowledge of check kiting scheme did not show bank assisted in fraud); *Marlin*, 248 F. App'x at 539 (opining that knowledge of "red flags" by a bank employee did not create a reasonable inference that she agreed to a conspiracy).

Imagine if a credit card company notices an unusual purchase on a card – say, a Rolex. Turns out, a fraudster stole the card and bought the fancy watch. Plus, the fraudster made a couple of other expensive purchases after that. And imagine if the credit company never froze the account.

Those facts might suggest that the credit card company subjectively believed that something was wonky. But none of those facts suggests that the credit card company *agreed to conspire* with the fraudster.

In sum, a reasonable jury could not find that evidence of the Bank Defendants' knowledge of questionable practices shows that the Bank Defendants agreed to join a conspiracy.

***Francione's Performance Reviews.*** Finally, the Court turns to Francione's performance reviews.

In their complaint, the Dental Practices theorized that Francione joined the conspiracy to earn annual bonuses. *See* Am. Cplt., at ¶ 102 (Dckt. No. 77). At the motion to dismiss stage, Judge Blakey inferred that "Francione's role went beyond a 'banker acting as a banker,' because she did . . . reap financial benefit by agreeing to join the alleged conspiracy." *See* 9/23/19 Mem. Opin. & Order, at 15 (Dckt. No. 116).

But discovery did not bear out that theory. Francione did not enjoy big cash bonuses. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 42 (Dckt. No. 318); Francione Dep., at 298:13 – 299:22 (Dckt. No. 275-13).

She did get a holiday ham one Christmas. *Id.* But "everybody" from First Eagle got a ham that year. *See* Francione Dep., at 298:17-19 (Dckt. No. 275-13). And it was just one year within the relevant 6.5-year period. *Id.* at 298:21. A ham isn't much of a reason to conspire, anyway. You can get only so much mileage out of a ham, even at Christmas time.

True, Francione might have earned some goodwill by bringing in high nonsufficient fund fees. In a 2014 self-appraisal, Francione listed the fees on Plaintiffs' accounts under the bolded header "Accomplishments." *See* Ex. 30, at 1 (Dckt. No. 294). Francione stated that "My dental

accounts [*i.e.*, for Dental Practices] (which have been opened over the past few years) brought in over $80,000 in service charge & NSF fee income." *Id.*

That same year, Christine Freund (Francione's supervisor) praised Francione in a performance review for the high nonsufficient fund fees generated from Plaintiffs' accounts. *See* Ex. 31, at 4 (Dckt. No. 294). Freund wrote: "There are now a total of 15 accounts for the Dental Offices and even though they do not carry very high balances, they have brought in $44,695.00 in NSF fees in 2013 and an additional $6,392.00 in service charges." *Id.*

Freund did not leave Francione an entirely positive review, either. Freund further noted: "Mikki exceeded her sales goals for the number of business accounts but did not meet her goal for personal accounts. The average balances for the accounts brought in were also very low and did not meet the dollar goals for both business and personal accounts." *Id.*

At best, Francione gained some goodwill from the nonsufficient fund fees. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 42 (Dckt. No. 318). She did not "reap financial benefit." She got a holiday ham, and a potential boost in job security (or a chance at promotions or raises).

Taking the evidence in the light most favorable to the Dental Practices, no reasonable jury could infer that Francione agreed to conspire with Vihnanek and Kelliher. A chance at a raise, and a ham at Christmas, cannot create a reasonable inference of an agreement to conspire under RICO.

As a practical matter, bankers theoretically boost their job security or chances at a promotion by bringing in business of any kind. If some possibility of career advancement suggests that a banker agreed to join a conspiracy, then bankers *would* "become racketeers by acting like bankers." *See Terry A. Lambert Plumbing, Inc.*, 934 F.2d at 981.

Merely mentioning a client in a self-evaluation form does not show agreement to conspire with that client. Francione's self-appraisal mentioned other businesses she brought in, too. *See* Ex. 30, at 1 (Dckt. No. 294) (names are redacted). The Dental Practices don't contend that she conspired with those clients.

The fact that Francione's performance reviews list her work on the accounts as an achievement does not show that she conspired with the Dental Practices. No reasonable jury could find that Francione intended to conspire with the Dental Practices because of her performance reviews.

One final point. On the motion to dismiss, Judge Blakey explained that "*Domanus* undermines Francione's argument that she did not agree to participate in the alleged conspiracy . . . . The very nature of the alleged conspiracy confirms that Kelliher or Vihnanek could not have carried out the alleged scheme alone. Instead, the allegations demonstrate they needed Francione, a First Eagle employee, to facilitate the scheme." *See* 9/23/19 Mem. Opin. & Order, at 14 (Dckt. No. 116).

In *Domanus*, the Seventh Circuit explained that "[c]laims that lawyers have conspired with their clients are insufficient in the absence of allegations that the arrangement involves more than standard legal representation." *Domanus*, 847 F.3d at 482.

As this Court sees it, *Domanus* stands for the proposition that a facilitator – who becomes liable under RICO – must do something that goes above and beyond their job description.

Imagine a referee in a hockey game who watches a player throw a couple of punches before blowing his whistle. That referee is simply acting like a referee. The referee has not agreed to conspire with the aggressive player.

The evidence shows that Francione was like that referee – she just acted as a banker, nothing more. Nothing shows she *facilitated* the scheme. So, *Domanus* does not lend a hand.

Drawing all reasonable inferences in the Plaintiffs' favor (as the non-movants on Defendants' motion), the Court concludes that no reasonable jury could find that the Bank Defendants agreed to conspire with Vihnanek and Kelliher.

That conclusion is a sufficient basis to grant the Bank Defendants' motion for summary judgment. Plaintiffs have failed to come forward with sufficient evidence on one of the elements. Therefore, the Bank Defendants' motion for summary judgment on the RICO claims is granted.

### 2. Agreement to Commit Two Predicate Acts

In the interest of completeness, the Court turns to second requirement about an agreement, meaning the need for evidence of an agreement to commit two predicate acts. The punchline is that no reasonable jury could find that the Bank Defendants agreed that someone would commit two predicate acts.

Plaintiffs must show at least "two predicate acts of racketeering committed within a ten-year period." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). "The defendant need not personally commit a predicate act; rather, a plaintiff must allege that the defendant agreed that *someone* would commit at least two predicate acts in furtherance of the conspiracy." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis in original).

A party can prove an agreement through circumstantial evidence – but that evidence "must tend to exclude the possibility that the alleged conspirators acted independently." *See Domanus*, 847 F.3d at 482 (citing *Monsanto*, 465 U.S. at 767).

32

Plaintiffs allege the predicate acts as "interstate transfer[s] of stolen money" (in violation of 18 U.S.C. § 2314) and "mail fraud" (18 U.S.C. § 1341). *See* Am. Cplt., at ¶¶ 106–24 (Dckt. No. 77).; *see also* 9/23/19 Mem. Opin. & Order, at 5–6, 8–9 (Dckt. No. 116). The Bank Defendants take a different view. They believe that Plaintiffs' two alleged racketeering acts were "a series of wire frauds against Plaintiffs, as well as wire fraud against [non-party] AFO Dental Group." *See* Defs.' Resp. to Pls.' Mem. for Summ. J., at 19 (Dckt. No. 307).

The operative complaint alleges two predicate acts, including interstate transfer of stolen money and mail fraud (before amending, Plaintiffs only alleged wire fraud). *See* 9/23/19 Mem. Opin. & Order, at 5, 8 (Dckt. No. 116). So, the Court will assume that interstate transfer of stolen money and mail fraud are the predicate acts in ruling on the motion for summary judgment. Plenty of documents show that Kelliher deposited the same checks multiple times and engaged in transactions without having the necessary funds. *See* Pls.' Mem. for Summ. J., at 19 (Dckt. No. 285).

But even assuming the predicate acts occurred, whether the Bank Defendants *agreed* to them is a separate issue. The Dental Practices believe that a reasonable jury could find that the Bank Defendants agreed to the two predicate acts because First Eagle ignored questionable practices by Vihnanek and Kelliher and never gave Dr. Li a call. *Id.* The Dental Practices basically ask the Court to infer that the Bank Defendants assisted Vihnanek and Kelliher (and thus agreed to the predicate acts) because First Eagle ignored their questionable practices and never contacted Dr. Li. *Id.*

The Bank Defendants dispute that they ignored the questionable practices at all. True, they never contacted Dr. Li. But they did regularly speak with Kelliher about the questionable financial transactions. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 57–58 (Dckt. No. 275).

33

Even if the Bank Defendants ignored those practices, their ignorance does not lead to the reasonable inference that they agreed to commit the predicate acts.

For one, a bank must process checks. Any financial misconduct involving a check, by definition, will involve a bank.

Also, *ignorance* does not show *agreement*. Put differently, evidence that First Eagle ignored some questionable practices, and did not contact Dr. Li, does not "tend to exclude the possibility" that Vihnanek and Kelliher acted alone. *See Domanus*, 847 F.3d at 482. Ignorance isn't always bliss, and sometimes it can be a sign of negligence. The evidence offered by Plaintiffs might support a negligence claim, but it doesn't get a RICO claim off the ground.

In sum, no reasonable jury could find that the Bank Defendants agreed to commit two predicate acts. The Bank Defendants are thus entitled to judgment as a matter of law.

## C.    Statute of Limitations

The next issue is the timeliness of the RICO claims. The Bank Defendants moved for summary judgment based on the statute of limitations.

A RICO claim has a four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Stating the rule is easy, but applying that rule in the case at hand is a bit more complicated.

Before diving in, remember three key dates. The parties agree that the embezzlement began in 2010. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 60, 62 (Dckt. No. 318); Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 25, 54 (Dckt. No. 308). Plaintiffs filed the complaint on December 20, 2017. And four years earlier was December 20, 2013.

Figuring out the timeliness of the claims depends on the answers to a few questions. The timeliness depends on when the four-year clock started ticking, and how many clocks there are.

The first question is when the claims accrued – that is, when the four-year clock started to tick. If the claims accrued in 2010 (or any other time before December 2013), then any claims about any injuries from 2010 to December 2013 are late. Plaintiffs would be out of time, and out of luck. The answer to that question depends on the so-called discovery rule.

The second question is whether the entire claim is untimely if part of the claim is untimely. If the clock started ticking before December 2013, then is the entire claim untimely? That is, is the claim untimely for injuries that took place from 2013 to 2017, meaning injuries that took place within the four-year period? Or is the claim untimely for 2010 to 2013 (only)? The answer to that question depends on the so-called separate accrual rule.

Based on the record, the Court concludes that the RICO claims are untimely for injuries that took place from 2010 to December 2013. Plaintiffs knew or should have known that they had suffered an injury during that period. So under the discovery rule, they waited too long by waiting until 2017 to file suit.

But the RICO claims are timely from December 2013 to the end of the scheme (in June 2016). Each act of embezzlement was a new act with a new injury that started a new clock. So under the separate accrual rule, the claims from December 2013 to the end are timely.

The Court will start with the discovery rule, and then will turn to the separate accrual rule.

### 1. The Discovery Rule

The first question is when the RICO claims accrued, meaning when the time started ticking on the four-year clock. The Court concludes that the clock started ticking in 2010, because Plaintiffs knew or should have known of the injury at that point.

A discovery rule applies to RICO claims. A RICO claim has a four-year clock, and it starts to tick when the plaintiff knew or should have known of the injury. *See Rotella v. Wood*, 528 U.S. 549, 555 (2000).

"The statute of limitations for a civil RICO cause of action is a fairly generous four years. It begins to run when the plaintiffs discover, or should, if diligent, have discovered, that they had been injured by the defendants." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009) (citing *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 800 (7th Cir. 2008)); *see also Maron v. Am. Enter. Bank*, 2022 WL 807379, at *2 (7th Cir. 2022) ("A RICO claim accrues when the plaintiffs knew or should have known of their injury."); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004) ("For [] RICO claims . . . a cause of action accrues when the plaintiff knew or should have known that it had sustained an injury. This rule is referred to as the discovery rule because the accrual date is not determined when the injury occurs but when it is discovered or should have been discovered.").

"[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555. "[T]he victim doesn't have to know he's been injured by a RICO violation, which is to say by a *pattern* of racketeering activity (that is, a series of predicate acts)." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 387 (7th Cir. 2010) (emphasis in original); *see also id.* ("For remember that it's the discovery of the injury (and injurer), not of the facts that establish a particular legal theory, that starts the limitations period running; the limitations period is the time allowed to the plaintiff for determining the specific violation upon which to base a suit.").

"A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations – the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *See Cancer Found.*, 559 F.3d at 674.

By way of example, the owners of the Bamboo Lounge in *Goodfellas* knew about the injury when the restaurant burned to the ground. The clock would start ticking even if the owners didn't know that the mob torched the joint for the fire insurance.

"There must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury." *Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 691 F. Supp. 2d 772, 791 (N.D. Ill. 2010) (St. Eve, J.) (citations omitted). "Therefore, the RICO statute of limitations begins to accrue when both a 'pattern of racketeering' – *i.e.* two predicate acts – has occurred, and when the plaintiff knows or should know he or she was injured." *Zalesiak v. UnumProvident Corp.*, 2007 WL 4365345, at *4 (N.D. Ill. 2007).

The discovery rule requires diligence on the part of the plaintiff. "[I]n a RICO case, the plaintiff must both use due diligence to discover that he has been injured and by whom even if the defendant is engaged in fraudulent concealment, and diligently endeavor to sue within the statutory limitations period or as soon thereafter as feasible." *Jay E. Hayden Found.*, 610 F.3d at 388.

In the case at hand, Judge Blakey denied the motion to strike the statute of limitations defense. *See* 9/17/20 Mem. Opin. & Order, at 6–7 (Dckt. No. 247). Judge Blakey called attention to Plaintiffs' ability to uncover the embezzlement: "Each Defendant alleges that, at all relevant times, Plaintiffs received monthly bank statements and maintained the ability and duty to monitor them for unauthorized activity but failed to do so, even though the account statements

would have revealed irregularities and other suspicious activities." *Id.* at 7. Those facts, taken as true, showed that the Dental Practices had notice since 2010. *Id.*

That conclusion flowed directly from a body of Seventh Circuit precedent. Plaintiffs cannot complain about old fraud if they could have looked at records that would have revealed the misconduct. A person who has access to information at their fingertips, but doesn't pick it up and take a look, cannot get out from under the statute of limitations. *See, e.g.*, *Graves v. Combined Ins. Co.*, 1996 WL 459928, at *2 (7th Cir. 1996) (affirming the dismissal of a civil RICO case and concluding that plaintiffs should have uncovered their alleged injury since an insurance policy stated the discrepancy); *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 466 n.18 (7th Cir. 1990) (affirming an order granting summary judgment) ("[P]laintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice."); *Eckstein v. Balcor Film Invs.*, 58 F.3d 1162, 1168 (7th Cir. 1995) (affirming an order granting summary judgment on statute of limitations defense because registration statement put investors on constructive notice, despite prospectus statement omitting certain information); *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 675 (7th Cir. 2009) (affirming an order dismissing the case on statute of limitations grounds where the alleged conspiracy began 10 years before plaintiffs filed suit).

Courts widely recognize that a potential plaintiff cannot sit on his hands instead of looking at information right under his nose. A potential plaintiff cannot sit back, relax, and enjoy the ride. *See, e.g.*, *Grumhaus v. Comerica Sec., Inc.*, 2003 WL 21504185, at *3 (N.D. Ill. 2003) (granting summary judgment and concluding that plaintiff was on inquiry notice when she received statements to her address showing the alleged fraud); *In re AIG Workers Comp. Ins. Policyholder Litig.*, 2015 WL 1992723, at *5 (N.D. Ill. 2015) (concluding, in RICO case, that

plaintiffs were on inquiry notice of fraud from the "vast amount" of publicity about it); *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2006) (upholding a decision granting summary judgment in a RICO case on statute of limitations grounds where "plaintiffs did not exercise the due diligence expected of a reasonable investor because they failed to undertake any investigation into the meaning of the storm warnings beyond asking defendants whether their plans were legitimate").

Oftentimes, the discovery rule is a jury question, because a jury often decides when a party discovered or should have discovered the injury. But not always. "Determining the point under the discovery rule at which the running of the limitations period commences is a question for the trier of fact, unless the parties do not dispute the facts and only one conclusion may be drawn from them." *Kedzierski v. Kedzierski*, 899 F.2d 681, 683 (7th Cir. 1990); *see also Gieringer v. Silverman*, 731 F.2d 1272, 1274 (7th Cir. 1984) (holding that "summary judgment [was] an appropriate vehicle for the resolution of a statute of limitations defense when the due diligence of the plaintiffs [was] in issue").

The Bank Defendants argue that the RICO claims arrived too late because the Dental Practices knew or should have known of the injuries long before December 2013. As they see it, "Plaintiffs should have known of their injury prior to the running of the statute on [ ] 2013, by which time Plaintiffs had received more than two years of bank statements reflecting every check they now claim was embezzled."[3] *See* Defs.' Mem. in Support of Summ. J., at 11 (Dckt. No. 274).

---

[3] The parties discuss a dividing line of May 25, 2013, instead of December 20, 2013. Plaintiffs filed the complaint at hand on December 20, 2017, so December 20, 2013 (*i.e.*, four years earlier) seems like a natural dividing line. But the parties point to May 25, 2013 because Plaintiffs apparently filed a complaint in state court at that point. Given the reassignment of this case, this Court does not know the full procedural backstory. But this Court is not so sure that May 25, 2013 is the right dividing line (instead of December 20, 2013). The filing of an amended complaint in federal court can relate back to

More specifically, the Bank Defendants point to three reasons why the Dental Practices could have uncovered the alleged conspiracy by 2010. First, Dr. Li knew that Vihnanek and Kelliher had bank fraud convictions. Second, Dr. Li threatened to shut down Dental Practice Development in August 2010, based on misuse of Plaintiffs' funds for personal expenses and repeated warnings from employees and vendors. Third, Dr. Li could access bank statements showing the alleged misconduct from the start of the conspiracy. *See* Defs.' Mem. in Support of Summ. J., at 11 (Dckt. No. 274) (citing Defs.' Statement of Facts, at ¶¶ 16–19, 45, 64–65 (Dckt. No. 275)).

For their part, the Dental Practices agree that their claims are time-barred if they "should have known" of the fraud by 2013. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 5 (Dckt. No. 326). But in their view, "nothing in the record [shows] that William Li should have been suspicious" before 2013. *Id.* at 8.

The Court disagrees. Red flags flew left and right, up and down, like a May Day parade.

Based on the record as a whole, the Court concludes that a reasonable jury could reach only one conclusion. Dental Practice Development and the other Plaintiffs knew or should have known that they suffered an injury, but did nothing. They sat on their rights, so the statute of

---

the filing of an earlier complaint in federal court. But the parties don't cite anything for the proposition that an earlier state case tolls the statute of limitations for a later federal complaint. Based on the Court's research, there is some authority to the contrary. *See Bd. of Managers of Dunbar Lakes Condos. Nos. I., II, III, IV, V, VI, VII, VIII, IX & X v. Dunbar Homes, Inc.*, 1991 WL 18194, at *11 (N.D. Ill. 1991) ("This court has found no case which holds that the filing of a prior state court fraud action provides a basis for tolling the statute of limitations on a federal RICO action. Prior judicial actions do not toll the statute of limitations no matter how close their relationship to the one at bar.") (cleaned up); *Joseph v. Bach & Wasserman, L.L.C.*, 487 F. App'x 173, 176–77 (5th Cir. 2012) (concluding that state-court suit involving only state-law claims did not toll the statute of limitations on RICO claim); *Grimmett v. Brown*, 75 F.3d 506, 515 (9th Cir. 1996) (concluding that pendency of bankruptcy proceeding did not toll RICO claims); *McKinney v. Martinez*, 2017 WL 1023340, at *1 (D. Nev. 2017), *aff'd,* 700 F. App'x 729 (9th Cir. 2017) (concluding that plaintiff was not entitled to equitable tolling in part because he was aware of his RICO claim when he filed a lawsuit in state court). If the parties believe that the right dividing line is May 25 instead of December 20, 2013, they can file a motion and offer supporting authority.

limitations has run on the RICO claims (for the most part, anyway). The clock has now run, and Plaintiffs are out of time.

The first warning flag went up the pole long before the alleged scheme began. Vihnanek and Kelliher are convicted felons. They met in prison, while serving time for financial crimes. Dr. Li knew about the financial frauds. And he hired them anyway, putting the convicts in charge of the company's finances. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 16–18 (Dckt. No. 318); Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 8 (Dckt. No. 308)*.*

Dr. Li entrusted the finances of the Dental Practices to two convicted felons. *Id.* Convicted felons with a history of financial crimes are not the most trustworthy custodians of the company coffers. It's not much different than handing the keys to a driver with a history of drunk driving.

The problem is not simply that Dr. Li hired convicted felons. He hired convicts, and then he looked away. He placed blind trust in two people with a track record of untrustworthiness.

No reasonable jury could conclude that Dr. Li acted with diligence by handing the keys to the vault to two convicted felons, and then looking away. Due diligence requires investigating alleged mismanagement by a person with a bank fraud felony. *See, e.g.*, *Lorber v. Winston*, 962 F. Supp. 2d 419, 442–43 (E.D.N.Y. 2013) (holding that plaintiff was on inquiry notice about possible fraud because of criminal indictment against son-in-law).

Dr. Li also received early warning signs about possible financial issues. In August 2010, eight months into the alleged scheme, Dr. Li wrote an email about "mismanagement," including financial mismanagement. *See* 8/26/10 Li Email (Dckt. No. 275-30).

The situation was so dire that Dr. Li threatened to shut down the company. "At this moment Dental Practice Development will be disbanded in its entirety by the end of this year unless I believe it's future can be altered." *Id.*

The email addressed a number of issues, and only some of them involved financial issues. But Dr. Li did address the fact that the company had too many expenses. "DPD is so top heavy that it stimied [sic] all our future options. *We will look at all ongoing expenses* (staff auto, loans etc.) and the company gas card will be cancelled immediately. We do not need a company auto. It will be disposed at the earliest opportunity. DPD, if it is to survive, will be reengineered STAT." *Id.* (emphasis added).

Dr. Li added: "Management team have only focused superficially on the needs of Company due to their comfort and personal interests and forgot the most crucial duties to help the doctors do their jobs effectively and protect my license from malpractice!" *Id.*

Plaintiffs contend that, by "comfort," Dr. Li only meant that he would nix previously authorized expenses like auto loans and gas cards. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 5–6 (Dckt. No. 326). Still, Dr. Li was on notice about the company's high expenses. And he recognized the need to "look at all ongoing expenses." *Id.*

Dr. Li admitted that he would have uncovered embezzlement if he had investigated. *See* Li Dep., at 100:21-23 (Dckt. No. 282-10). But Dr. Li testified that he never looked at the Dental Practices' financials after the August 2010 email. *See id.* at 88:16-24.

Dr. Li had the ability to look under the hood, and see the company's finances. True, Dr. Li did not receive mailed statements. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 9 (Dckt. No. 326). But no one disputes that he could *access* them if he wanted to take a look.

42

During the embezzlement period, Dr. Li had the ability to access and review monthly bank statements, canceled checks, and other records for all of Plaintiffs' accounts. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 43–45 (Dckt. No. 318). Dr. Li could look at QuickBooks ledgers with Plaintiffs' accounting information, too. *Id.* at ¶ 61. And Kelliher would sometimes show Dr. Li profit-and-loss statements. *See* Li Dep., at 328:2-23 (Dckt. No. 282-10). While Dr. Li did not receive bank statements in the mail, he *could* have checked them. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 9 (Dckt. No. 326).

But Dr. Li *never* checked the monthly statements until June 2016. *See* Li Dep., at 66:6 – 67:17 (Dckt. No. 282-10). He didn't ask to see any materials, either. *Id.*

If Dr. Li had looked, he would have seen a lot of problems. Dr. Li admitted that he would have seen "a lot" of nonsufficient fund fees in 2010 if he had checked the bank statements. *See* Li Dep., at 100:21-23 (Dckt. No. 282-10).

True, the warning signs of embezzlement turned from storm clouds to a full-on hurricane a few years later. In summer 2015, Kelliher's assistant, Lynn Jumes, told Li's wife to investigate Kelliher's financial misconduct. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 71 (Dckt. No. 318).

A couple months later, in October 2015, Dr. Li finally did a mini-audit of the QuickBooks – which he had access to all along – and discovered that Kelliher had written lots of "suspicious" checks from Dental Practices' accounts. *Id.* at ¶ 72; *see also* Li Dep., at 191:7 – 196:14 (Dckt. No. 282-10).

But the duty to investigate arises *before* hurricane season starts. Ill winds were blowing long beforehand. To put things differently, a homeowner should exit the house when the smoke detector starts beeping – not wait until flames are billowing.

43

Suspicious circumstances triggered Li's duty to investigate by at least August 2010. Dr. Li entrusted the company to convicted felons with a history of financial crimes. He threatened to shut down Dental Practice Development for mismanagement. He said he would look at the books, but he did not. And the same type of fraudulent transactions went on for nearly six more years.

Basically, Dr. Li knew that bad drivers were behind the wheel of his companies. And he heard funny sounds rattling from the engine. He had the keys in his hand, but did not take the time to look under the hood.

Viewed in the light most favorable to the Dental Practices, the facts could support only one conclusion by a reasonable jury. Dr. Li knew or should have known of the injury by August 2010. So the claim accrued in August 2010, and the four-year clock started ticking. By waiting until December 2017 to file suit, the clock ran out. If this case doesn't satisfy the "should have known" standard, it is hard to see what case would.

### 2. The Separate Accrual Rule

The next question is whether any part of the RICO claim survives if some of the claim is time-barred. If the claim is untimely for injuries suffered before December 2013, is the claim untimely for injuries suffered after December 2013, too? Does the whole claim fail as untimely? Or only part of the claim?

For example, imagine a ten-year scheme of racketeering behavior – say, an organized effort to pull over delivery trucks and steal their goods, like in *Goodfellas*. Imagine if the truck owner learned of the injury in Year 2, but did nothing. And then imagine if the truck owner finally got fed up and sued the mob boss in Year 10. Could the truck owner recover for the

thefts from Year 6 to Year 10? Or does the existence of knowledge in Year 2 doom any claim for Year 6 to Year 10, too?

The answer depends on the so-called separate accrual rule. "[A] new cause of action under RICO arises on the occurrence of each separate injury, and a suit to recover for that injury must be brought within the limitations period." *See McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992); *see also id.* at 1465 n.10 ("Under a separate accrual rule, a new cause of action accrues only when there is a new instance of wrongful conduct *and* a new injury. Different injuries flowing from the same conduct are not usually actionable in separate lawsuits.") (emphasis in original).

The Supreme Court has not expressly adopted the separate accrual rule in the RICO context. But the Supreme Court has not cast shade on that doctrine, either. Instead, the Supreme Court acknowledged in *Klehr* that some circuits follow the separate accrual rule, without commenting one way or the other. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) ("[S]ome Circuits have adopted a 'separate accrual' rule in civil RICO cases, under which the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act."). And in the meantime, the separate accrual rule remains good law in this Circuit.

It is important to bear in mind what the separate accrual rule is *not*. The separate accrual rule is not about bringing old claims back to life. Years ago, some courts held that a cause of action accrues when the last predicate act takes place. And under that theory, a claim about early predicate acts is timely as long as the last predicate act falls within the limitations period.

That's the so-called last predicate act rule. The Supreme Court squarely rejected that approach in *Klehr*. "[T]he plaintiff cannot use an independent, new predicate act as a bootstrap

45

to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190; *see also Jay E. Hayden Found.*, 610 F.3d at 386–87 ("[T]he injury arising from the first predicate act to injure the plaintiff ('predicate acts' are the illegal acts committed by the racketeering enterprise) starts the limitations period running, rather than the injury from the last predicate act, which might occur decades after the first."); *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) ("Suppose that year after year, for ten years, your employer pays you less than the minimum wage. That is a continuing violation. But it does not entitle you to wait until year 15 (assuming for the sake of illustration that the statute of limitations is five years) and then sue not only for the wages you should have received in year 10 but also for the wages you should have received in years 1 through 9. The statute of limitations begins to run upon injury (or, as is standardly the case with federal claims, upon discovery of the injury) and is not tolled by subsequent injuries.").

Once a clock starts ticking, it *keeps* ticking. If a party discovers an injury, then that party is on the clock, and the discovery of a future injury does not restart the clock for a past injury. The existence of new predicate acts cannot restart the clock for old predicate acts. And when time runs out, time's up.

The last predicate act rule is different than the separate accrual rule. The last predicate act rule is about whether a new act can restart the clock on an old act. That is, the last predicate act rule is about whether something new can bring something old back from the dead. It's about restarting an old clock that already lapsed.

The separate accrual rule is about whether a new act can get a new clock. That is, the separate accrual rule is about whether something new can be timely, even if time already ran out

46

on an old clock. It's about starting a new clock for something new, not restarting an old clock for something old.

Putting them together, the (discredited, no-longer-valid) last predicate act rule and the separate accrual rule work in tandem, and help to explain the relationship between old acts and new acts when it comes to the statute of limitations. New acts and new injuries cannot revive the statute of limitations about old acts and old injuries, and bring expired claims back to life. *See Klehr*, 521 U.S. at 190. That's the last predicate act rule, and that's not the law. And on the flipside, old acts cannot cut short the statute of limitations on new acts that cause new injuries within the limitations period. That's the separate accrual rule, and that *is* the law (in this Circuit, anyway).

Consider, once again, the illustration about *Goodfellas*. Again, the truck owner suffered an injury from Year 1 to Year 10, when he finally filed suit. The separate accrual rule would determine whether the truck owner could bring a claim about Year 6 to Year 10. But the truck owner could not argue that a claim about Year 1 to Year 6 is timely, based on a timely claim about Year 6 to Year 10. That's the last predicate act rule, and that's not the law.

The case at hand is not much different than the illustration about *Goodfellas*. Again, Vihnanek and Kelliher embezzled funds from 2010 to 2016, and Dental Practices Development filed the complaint in December 2017. As explained above, the claim is untimely from 2010 to December 2013, meaning everything except the four years before the filing of the complaint. It's untimely because of the discovery rule – Dr. Li knew or should have known about the injury starting in 2010. So the clock started.

But the claim is timely starting in December 2013. The separate accrual rule applies "when there is a new instance of wrongful conduct *and* a new injury." *See McCool*, 972 F.2d at

1465 n.10 (emphasis in original).  Each act of embezzlement was a new wrongful act, creating a new injury.  Each time a hand goes into the cookie jar, there is a new act and a new injury.

Cases under the Clayton Act provide a helpful analogy.  *See Klehr*, 521 U.S. at 189 ("As the Court has explained, Congress consciously patterned civil RICO after the Clayton Act.").  Each time a member of an antitrust conspiracy sells a product to a customer at an artificially inflated price, that act causes a new injury.  And that injury starts a new clock for that injury.

"Antitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.,* each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'"  *Klehr*, 521 U.S. at 189; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."); *Bray v. Bank of Am. Corp.*, 784 F. App'x 738, 741 (11th Cir. 2019) ("When an alleged antitrust conspiracy results in ongoing sales or the collection of payments over time, we have said that each sale or payment constitutes a new 'act' that starts the running of the statute of limitations."); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) ("[T]he Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from

48

the date of the act."); *but see US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) ("We thus conclude that each supracompetitive price charged to US Airways by Sabre pursuant to the 2006 contract was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract.").

A sale at an artificially inflated price is not much different than theft. Both involve extracting money from the other party through improper means. In the antitrust context, a claim accrues each time a conspirator sells a product to a customer at an artificially high price. By the same token, a claim accrues each time an employee commits a new act of embezzlement. Each new act of theft created a new injury, and thus started a new four-year clock under RICO.

Here, each act of embezzlement by Vihnanek and Kelliher was a new act that caused a new injury. So any claim from December 2013 to the end of the scheme is timely.

### 3.     Fraudulent Concealment

Last, Plaintiffs argue that the doctrine of fraudulent concealment tolls the statute of limitations. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 8 (Dckt. No. 326).

The Supreme Court has concluded that in civil RICO cases, "a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997); *see also Jay E. Hayden Found.*, 610 F.3d at 388.

As explained above, the Dental Practices did not exercise reasonable diligence. Dr. Li never looked at a bank statement (or tried to do so), even after threatening to shutter Dental Practice Development for mismanagement. *See* Li Dep., at 66:6 – 67:17 (Dckt. No. 282-10). So the doctrine of fraudulent concealment does not apply.

\*          \*          \*

49

In sum, Plaintiffs' motion for summary judgment is denied, and Defendants' motion for summary judgment is granted, for the RICO claims. *See* Counts III & IV.

There is a genuine issue of material fact about whether the Bank Defendants had knowledge of the alleged conspiracy. There is enough evidence in the record to support a finding by a reasonable jury that the Bank Defendants acted with willful blindness. But the evidence is not so lopsided that a reasonable jury would have to reach that conclusion.

Plaintiffs failed to come forward with sufficient evidence to support a finding by a reasonable jury on the two requirements about an agreement. Specifically, the record could not support a finding that the Bank Defendants agreed to participate in a conspiracy. And the record could not support a finding that the Bank Defendants agreed that someone would commit two predicate acts. In light of the absence of evidence on essential elements, the Bank Defendants are entitled to summary judgment.

Finally, the Bank Defendants are entitled to summary judgment in part, based on the statute of limitations. The RICO claims are time-barred for the period before December 2013 because Plaintiffs knew or should have known that they had suffered an injury (under the discovery rule). The RICO claims are not time-barred for the period from December 2013 until the end of the scheme because each act of embezzlement during that period started a new four-year clock (under the separate accrual rule).

## II.     Illinois Fiduciary Obligations Act (Count VIII)

The last remaining claim arises under state law. Count VIII alleges that the Bank Defendants violated the Illinois Fiduciary Obligations Act ("IFOA"). *See* Am. Cplt., at ¶¶ 296–314 (Dckt. No. 77).

A.      Statute of Limitations

A five-year statute of limitations applies to claims under the Illinois Fiduciary

Obligations Act.  *See* 735 ILCS 3/13-205; *see also* 9/17/20 Mem. Opin. & Order, at 9 (Dckt. No.

247).  The cause of action accrues "when the plaintiff knew or reasonably should have known of

the injury and that it was wrongfully caused."  *Fuller Family Holdings, LLC v. N. Tr. Co.*, 863

N.E.2d 743, 756 (Ill. App. Ct. 2007); *see also In re Emerald Casino, Inc.*, 867 F.3d 743, 760 (7th

Cir. 2017).

The relevant date here is December 20, 2012, meaning five years before Plaintiffs filed

suit.  *See* Defs.' Mem. in Support of Summ. J., at 1 (Dckt. No. 274).  That's an extra year

compared with RICO.  But the extra year does not change the outcome.

As detailed above, the Dental Practices had reason to know of the injury by at least

August 2010.  That's when Dr. Li sent an email threatening to shut down Dental Practice

Development over "mismanagement" concerns.  *See* 8/26/10 Li Email (Dckt. No. 275-30).

Dr. Li said that he would look at the expenses then, but he never did.  *Id.*

Dr. Li could have reviewed Plaintiffs' accounts the whole time, but he never did.  *See*

Pls.' Resp. to Defs.' Mem. for Summ. J., at 9 (Dckt. No. 326).  And from day one, Dr. Li knew

that he had entrusted the finances of the company to two convicted felons who committed

financial crimes.

Still, Plaintiffs argue that even if they had inquiry notice, "the doctrine of fraudulent

concealment tolls the statute."  *Id.* at 8.  For their part, the Bank Defendants say that there is "no

proof" that they engaged in fraudulent concealment.  *See* Defs.' Reply to Pls.' Resp., at 8 (Dckt.

No. 338).

Illinois courts have "declined to apply fraudulent concealment for the running of the statute of limitations where 'the claimant discovers the fraudulent concealment, or should have discovered it through ordinary diligence, and a reasonable time remains within the remaining limitations period.'" *Turner v. Nama*, 689 N.E.2d 303, 309 (Ill. App. Ct. 1997) (quoting *Smith v. Cook County Hosp.*, 518 N.E.2d 336, 340 (Ill. App. Ct. 1987)).

Instead, tolling can take place only where the plaintiff shows that "the defendant engaged in affirmative acts or representations designed to prevent discovery of the cause of action or to induce the plaintiff into delaying the filing of its claim." *J.S. Reimer, Inc. v. Vill. of Orland Hills*, 990 N.E.2d 831, 842–43 (Ill. App. Ct. 2013). "And, mere silence of a defendant accompanied by a plaintiff's failure to discover the cause of action does not constitute fraudulent concealment. . . . Moreover, fraudulent concealment of a cause of action by one other than the defendant usually does not toll the running of the limitation period unless the concealer is in privity with or occupies an agency relationship with defendant." *Thomson v. McDonald's, Inc.*, 536 N.E.2d 760, 762 (Ill. App. Ct. 1989) (citations omitted).

The Dental Practices' fraudulent concealment argument fails because they could have discovered the fraud through reasonable diligence. As explained above, Dr. Li could access the entities' financial information throughout the scheme. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 43–45 (Dckt. No. 318). A quick look at QuickBooks was all it took for him to see suspicious financial activity. *See* Li Dep., at 191:1 – 196:14 (Dckt. No. 282-10).

Ordinary diligence would have led to an extraordinary discovery: widespread, far-reaching, long-lasting embezzlement. He simply needed to open the company's books. And by keeping them closed, fraudulent concealment does not apply.

Finally, Plaintiffs argue that even if the statute of limitations applies, it should apply only to the extent that conduct occurred before December 20, 2012. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 19–20 (Dckt. No. 326). The Court agrees on this point.

Judge Blakey explained that "the continuing violation [doctrine] does not apply to toll the accrual of the statute of limitations for Plaintiffs' IFOA claim, and Defendants plausibly assert that the statute of limitations bars that claim to the extent premised upon any allegations of misconduct occurring *before May 25, 2012*."[4] *See* 9/17/20 Mem. Opin. & Order, at 10–11 (Dckt. No. 247) (emphasis added).

So the incidents of alleged fraud that occurred after December 20, 2012 (*i.e.*, five years before the filing of the complaint) survive the challenge under the statute of limitations.

## B. Bad Faith

The Illinois Fiduciary Obligations Act softens the amount of diligence required of banks. The statute "relieves the bank of liability for negligence and acts as a defense to allegations that the bank acted negligently." *Cont'l Cas. Co. v. Am. Nat'l Bank & Tr. Co. of Chicago*, 768 N.E.2d 352, 365 (Ill. App. Ct. 2002); *see also Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987). A bank has no "obligation to inquire whether a fiduciary is committing a breach when it permits fiduciaries to make withdrawals, so long as the bank acts without bad faith or actual knowledge of the fiduciary's breach." *Geimer v. Bank of Am., N.A.*, 784 F. Supp. 2d 926, 932 (N.D. Ill. 2011).

Plaintiffs only argue that the Bank Defendants acted in bad faith, not they had actual knowledge. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 43 (Dckt. No. 326) ("Plaintiffs' claim is based on the statutory exception of bad faith.").

---

[4] Once again, the parties point to May 25 instead of December 20.

Bad faith occurs when a bank does not meet its duty to inquire. *See Cnty. of Macon v. Edgcomb*, 654 N.E.2d 598, 601 (Ill. App. Ct. 1995). Generally, a bank has no duty to inquire when fiduciaries make withdrawals. *See Geimer*, 784 F. Supp. 2d at 932; *see also Cotton v. PrivateBank & Tr. Co.*, 2003 WL 360099, at *3 (N.D. Ill. 2003) (explaining that the duty to inquire "does not arise merely when the party becomes aware" of the fiduciary relationship).

"Mere suspicious circumstances are not enough to require the Bank to inquire." *Johnson v. Citizens Nat. Bank of Decatur*, 334 N.E.2d 295, 299 (Ill. App. Ct. 1975). A bank's obligation to inquire arises when it is "commercially unjustifiable for the payee to disregard and refuse to learn facts readily available," or when "obvious circumstances become so cogent that it is bad faith to remain passive." *Appley*, 832 F.2d at 1031 (citation omitted). A bank acts in bad faith when it suspects improper conduct by a fiduciary and deliberately refrains from investigating to avoid knowing about the improper conduct. *See Mikrut v. First Bank of Oak Park*, 832 N.E.2d 376, 385 (Ill. App. Ct. 2005); *see also Edgcomb*, 654 N.E.2d at 601.

"[W]hen the fiduciary makes withdrawals by checks the depository is not bound to inquire for what purpose the withdrawals are made, whether the checks are made payable to the fiduciary personally, or as fiduciary, or to third persons." *Johnson*, 334 N.E.2d at 299.

Kelliher was an authorized fiduciary of the Dental Practices. *See* Pls.' Resp. to Defs.' Mem. for Summ. J., at 44 (Dckt. No. 326). He was a co-owner of Dental Practice Development (the managing company) and one of the dental practices (All Family Dental). *Id.* at 2.

The Dental Practices argue that the Bank Defendants ignored red flags like high overdraft fees, misstated account balances, and irregularities with checks (*e.g.*, mismatched addresses or missing signatures). *Id.* at 23–35.

Evidence produced in discovery shows that bank executives received daily overdraft reports. *See* Kaveney Dep., at 201:12-24, 202:6-24 (Dckt. No. 294-18). The Dental Practices' accounts accumulated about $339,000 in overdraft fees between January 2010 and June 2016. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 54 (Dckt. No. 308). First Eagle's banking expert testified that, in his 50-year banking career, he had "never seen a depositor have as many overdrafts as this particular depositor or plaintiffs had." *See* Zacharias Dep., at 279:3-13 (Dckt. No. 294-19). The Bank Defendants might have had cause to look into those overdraft fees.

And there's some evidence suggesting that the Bank Defendants subjectively believed that Kelliher's conduct was improper. For one, a First Eagle employee, Christine Freund, sent First Eagle CEO Andy Salk an email saying that the accounts had "chargebacks (kiting) in the past, but this should be almost eliminated now." *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 72 (Dckt. No. 308). On a different occasion, a different First Eagle employee emailed Francione that Kelliher's conduct was "questionable" and that he was "full of tricks." *See* Ex. 36 (Dckt. No. 294-36). A reasonable jury could view those emails as evidence of suspicious circumstances that required the Bank Defendants to further investigate.

The Bank Defendants contend that they did not close their eyes and shut their ears to signs of embezzlement. *See* Defs.' Mem. in Support of Summ. J., at 24 (Dckt. No. 274).

Instead, they asked Kelliher about the overdrafts, he said they were caused by cash flow problems, and they took him at his word. *See* Pls.' Resp. Defs.' Statement of Facts, at ¶¶ 57–58 (Dckt. No. 318); Kelliher Dep., at 492:4-24 (Dckt. No. 275-9) ("[If asked about why the accounts were so frequently overdrawn] I would have said – I believe – it was cash flow. It was the fact that we hadn't been paid by this contract or that contract . . . ."); Francione Dep., at 318:3-21 (Dckt. No. 275-13) ("When the overdrafts started on a more regular basis . . . they

probably told me that that is why it was happening, because they had to make up for this money that was no longer coming in.").  And if there was an issue with a deposited check (*e.g.*, if Kelliher deposited the same check twice), the Bank Defendants spoke with Kelliher, warning him to exercise more care when making deposits.  *See* Francione Dep., at 215:14-21 (Dckt. No. 309-4).

Viewed in the light most favorable to Plaintiffs as the non-movants, the evidence suggests that, at most, the Bank Defendants were negligent in not looking into possible fraud on Kelliher's part.

Evidence cuts both ways on the issue of bad faith.  Thus, the Dental Practices can proceed with Count VIII for any injuries that arose after December 20, 2012.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied. Defendants' motion for summary judgment is granted in part, and denied in part.  Specifically, Defendants' motion for summary judgment is granted for the RICO claims, and is granted for the state law claim before December 20, 2012.  Defendants' motion for summary judgment is denied for the state law claim for the period after December 20, 2012.

Date:  February 14, 2024

Steven C. Seeger
United States District Judge